FEDERAL TRADE COMMISSION,
Plaintiff–Appellee,

v.

WORLD TRAVEL VACATION
BROKERS, INC., et al.,
Defendants–Appellants.

No. 87–3141.

United States Court of Appeals,
Seventh Circuit.

Argued June 10, 1988.

Decided Nov. 9, 1988.

As Corrected Nov. 15, 1988.

Ben Broocks, Robert S. Bennett, Bennett & Broocks, Houston, Tex., for defendants-appellants.

Melvin H. Orlans, F.T.C., Chicago Reg. Office, Chicago, Ill., for plaintiff-appellee.

Before BAUER, Chief Judge, and EASTERBROOK and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

The defendants-appellants, Scott Walker, his mother Carol Walker, and two corporate entities under their control, World Travel Vacation Brokers, Inc. (World Travel), and C–S–K Enterprises, Inc. (C–S–K), raise several challenges to the district court's grant of a preliminary injunction. The injunction, *inter alia*, restrains the defendants from engaging in deceptive advertising in violation of section 5 of the Federal Trade Commission Act (the FTCA), 15 U.S.C. § 45(a), and orders them to comply with the provisions of the Truth in Lending Act. 15 U.S.C. § 1601 *et seq.* The plaintiff-appellee, the Federal Trade Commission (the FTC), initiated these proceed-

ings after receiving numerous consumer complaints that the defendants' travel agency misrepresented the cost of vacation packages to Hawaii. The case was referred to a magistrate who recommended that a preliminary injunction be issued. The district court agreed and granted the preliminary injunction. We now affirm.

## I

### Background

#### A. *Procedural Posture*

The FTC commenced this action by filing a complaint in the district court on September 28, 1987. The complaint alleged that the defendants engaged in false and deceptive trade practices in violation of section 5 of the FTCA. The complaint also alleged that the defendants violated the Truth in Lending Act by failing to issue promptly consumer credit statements. *See* 12 C.F.R. § 226.12(e)(1); 15 U.S.C. § 1666(e). The complaint sought preliminary and permanent injunctive relief, including restitution, and any other appropriate equitable relief. Contemporaneously with the filing of the complaint, the FTC moved for a temporary restraining order to prevent the defendants from engaging in the allegedly fraudulent practices set forth in the complaint.

The district court granted the FTC's motion for a temporary restraining order, which included an asset freeze on all of the defendants' corporate and personal assets and compelled the defendants to produce certain corporate and individual financial records. *FTC v. World Travel Vacation Brokers, Inc.*, No. 87 C 8449 (N.D.Ill. Sept. 28, 1987) (temporary restraining order). That order subsequently was modified on November 16, 1987. The amended order extended the period for the defendants to

furnish the financial records until November 18, 1987. The defendants have not complied with the district court's order. The modified order also authorized the defendants to withdraw up to $125,000 of the frozen assets to pay for attorneys' fees. The FTC's request for a preliminary injunction was referred to a magistrate.

After a seven-day hearing, on December 16, 1987, the magistrate recommended that a preliminary injunction be issued against all of the defendants. She also recommended that the freeze of corporate and individual assets be continued. The district court implicitly adopted the recommendation of the magistrate and issued a preliminary injunction on December 18, 1987. The injunction was amended three days later. *FTC v. World Travel Vacation Brokers, Inc.*, No. 87 C 8449 (N.D.Ill. Dec. 21, 1987) (amended preliminary injunction). The defendants then timely filed a notice of interlocutory appeal challenging the validity of the preliminary injunction.[1]

#### B. *Facts*

This case involves an alleged scheme whereby World Travel, under the control of the individual defendants Scott and Carol Walker, fraudulently advertised and induced consumers to purchase vacations to Hawaii.[2] In particular, the defendants advertised and solicited consumers to purchase a $29 certificate which could be redeemed for roundtrip airfare to Hawaii, provided that consumers met additional conditions. The most important condition was that consumers book hotel reservations through World Travel for a minimum of eight days and seven nights at World Travel's calculated "hotel cost." The defendants also required a pre-booking deposit of $100 per person (which was not dis-

---

1. Jurisdiction in the district court is based on 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. § 1337(a) ("the district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce for protecting trade in commerce against restraints and monopolies"); and 28 U.S.C. § 1345 ("the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly

authorized to sue by Act of Congress"). Jurisdiction in this court is based on 28 U.S.C. § 1292(a)(1) ("the courts of appeals shall have jurisdiction of appeals from: [i]nterlocutory orders of the district courts of the United States ... granting ... injunctions").

2. The other corporate defendant, C–S–K, is a holding company controlled by the Walkers.

closed until the consumer received the certificate).

Despite the advertised claim of $29 airfare to Hawaii, however, the defendants charged consumers full airfare and hotel rates. They managed to hide the true aspect of the "hotel cost" through a three-part calculus. First, they added the air and accommodation costs together to determine the wholesale vacation cost. Then, an additional $50 profit per person was assessed; the $29 certificate price was not deducted from the price of the airfare nor from the total purchase price of the package. Finally, they divided this figure—the wholesale cost plus profit—by eight (the number of days booked), and represented the resulting amount to consumers as the daily "hotel cost" of the vacation. Nowhere did the defendants disclose that airfare was added into the "hotel cost" determination. Moreover, the method of division—based on the number of *days* stayed at the hotel, instead of the travel industry's custom of stating price on the basis of *nights*—further distorted actual costs imposed on the consumer. World Travel sold between 600,000 and 700,000 of the $29 Hawaiian vacation certificates.

The FTC also alleged that the defendants engaged in credit card fraud and failed to follow accurately federal law concerning the refund of cancelled credit purchases. Approximately ninety-nine percent of World Travel's customers purchased the $29 certificates with credit cards. By its own admission, "World Travel had difficulties with the credit card operations, especially from customers requesting a credit from World Travel, and also writing their credit card issuer for 'charge back' on their credit card." Appellants' Br. at 7 (citation omitted). The defendants submit that frequent changes of World Travel's "processors" caused the delays in credit card refunds.[3] After purchasing a certificate, a customer had three days to cancel the purchase and receive a refund. The problems with its processors led World Travel to implement an "11 Day Policy" to estimate whether customers were entitled to a refund.

> This policy was based upon the assumption that it would typically take four days by first-class mail for a certificate to arrive at a consumer's address; a consumer had three days to review the certificate for possible cancellation; and another four days through first-class mail to arrive back at World Travel's office. Thus, certificates received back by World Travel more than 11 days after mailing were deemed late.

*Id.* at 8 (citation omitted).

The FTC introduced evidence, that "in a number of instances, consumers provided defendants with documented proof that they had returned their certificates within 11 days of the date the certificates were mailed by defendants, yet defendants refused to issue refunds to these consumers." Appellee's Br. at 9. In addition, although World Travel represented to consumers that they would make prompt credit refunds, these refunds in many cases were delayed until customers complained.[4] The FTC presented evidence that the delayed funds were diverted to the personal accounts of the individual defendants.

## II

### District Court Proceedings

The district court issued a preliminary injunction, subsequently amended, enjoining several practices of the defendants. *FTC v. World Travel Vacation Brokers, Inc.*, No. 87 C 8449 (N.D.Ill. Dec. 21, 1987) (amended preliminary injunction). The court's order addressed four major points: (1) the district court noted that it had subject matter jurisdiction of the case; (2) it stated that the FTC likely would succeed

---

**3.** A processor handles the credit transactions between credit card issuers and businesses, like World Travel, that accept credit card sales from customers.

**4.** The defendants-appellants argue at some length that the district court ought not have admitted into evidence several bulky exhibits containing numerous unsworn consumer complaints. Appellants' Br. at 14–16. This is factually incorrect. Magistrate Gottschall refused to admit this evidence. Tr. of Dec. 9, 1987 at 13.

on the merits of both the FTCA and the Truth in Lending Act claims; (3) the court concluded that immediate and irreparable damage to the FTC's ability to effectuate relief for injured consumers would occur if the preliminary injunction was not issued; and (4) after weighing all of the equities in the case, the court determined that the preliminary injunction, including an asset freeze, would be in the public interest.

The district court entered this preliminary injunction on the recommendation of the magistrate who had conducted a hearing.[5] The magistrate first had confronted the issue of whether a court may grant preliminary injunctive relief under section 13(b) of the FTCA. 15 U.S.C. § 53(b).[6] That provision explicitly grants the district court jurisdiction to enter preliminary injunctions to preserve the status quo while the FTC conducts administrative proceedings. However, the last proviso in section 13(b) also grants the district courts authority to grant permanent injunctive relief after proof in "proper cases." After evaluating case law from other circuits, the magistrate decided that this permanent injunction proviso of section 13(b) permits the exercise of full equitable powers, including the ordering of temporary relief, even in the absence of administrative FTC proceedings. Although the magistrate noted language in this court's decision in *United States v. JS & A Group, Inc.*, 716 F.2d 451 (7th Cir.1983), that she believed could be construed as requiring a different result, she determined that the language merely was dictum which should not be read to control the case. Tr. of Dec. 16, 1987.

The magistrate then addressed whether this litigation is a "proper case" under the section 13(b) proviso. After noting that there exists some conflict between courts in determining the nature of a "proper case," the magistrate adopted the view that "any conduct which violates section 5 of the FTC Act is a proper case for consumer redress under section 13(b)." *Id.* at 31.

Section 5 prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce...." 15 U.S.C. § 45(a)(1). Accordingly, the magistrate concluded that this was a proper case under the statute.

Next, the magistrate examined whether the FTC should be granted a preliminary injunction and the appropriate scope of any such injunction. The magistrate noted that the court had to choose between two approaches in determining this issue: (1) it could apply the traditional equitable factors applied by courts in determining whether to grant injunctive relief; or, (2) it could apply the more lenient standard applied when an agency seeks to enforce a statute —likelihood of success and balancing of equities. The magistrate decided to apply the traditional four-part test for a preliminary injunction: likelihood of success; irreparable harm to the plaintiff; balance of equities; and the effect on public interest. With respect to the likelihood of success on the merits, the magistrate determined that the FTC would, in all probability, prevail on both the FTCA and Truth in Lending Act claims against both the corporate and individual defendants. The magistrate then "considered the relative interests of the parties, the potential harms to all interested persons, and the public interest in this case ... [and] concluded that a preliminary injunction, including an asset freeze, is appropriate here." Tr. of Dec. 16, 1987 at 47. The magistrate also concluded that it was necessary to protect the interests of the consumers already injured by ensuring a fund for restitution.

### III

### Analysis

A. *Power of the District Court to Grant a Preliminary Injunction*

The authority of the district court to grant the FTC a permanent injunction is

---

5. We note that the district court did not reject explicitly, or by inference, the factual recommendations of the magistrate. Therefore, we accept the findings of the magistrate unless clearly erroneous. *See Elmore v. Foltz*, 768 F.2d

773, 776 (6th Cir.1985); *see also Yates v. Mobile County Personnel Bd.*, 719 F.2d 1530, 1532–33 (11th Cir.1983).

6. *See* text *infra* for text of statute.

premised on the last clause of section 13(b) of the FTCA. That section reads as follows:

(b) Temporary restraining orders; preliminary injunctions

Whenever the Commission has reason to believe—

(1) that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and

(2) that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public—

the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond: *Provided, however,* That if a complaint is not filed within such period (not exceeding 20 days) as may be specified by the court after issuance of the temporary restraining order or preliminary injunction, the order or injunction shall be dissolved by the court and be of no further force and effect: *Provided further,* That in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction. Any such suit shall be brought in the district in which such person, partnership, or corporation resides or transacts business.

15 U.S.C. § 53(b).

■■ The defendants submit that, in an action seeking permanent injunctive relief on the basis of this last proviso of section 13(b), the district court has no authority to grant a preliminary injunction or any other relief ancillary to a permanent injunction. In contrast, relying on *Mitchell v. Robert DeMario Jewelry, Inc.,* 361 U.S. 288, 291–92, 80 S.Ct. 332, 334–36, 4 L.Ed.2d 323 (1960), and *Porter v. Warner Holding Co.,* 328 U.S. 395, 397–99, 66 S.Ct. 1086, 1088–90, 90 L.Ed. 1332 (1946), the FTC contends that it is well established that courts have inherent equitable powers to grant the type of preliminary relief requested here. According to the FTC, because Congress did not explicitly, or by necessary implication, limit the availability of ancillary remedies, this equitable doctrine should apply with full force. The FTC also submits that the legislative history of the statute supports its contention.

The defendants have waived this issue.[7] The entire discussion of the issue in their opening brief in this court consists of the following:

The FTC takes the position that pursuant to 15 U.S.C. § 53(b) of the Federal Trade Commission Act, this court is empowered to issue a temporary restraining order, a temporary injunction, and provide other ancillary equitable relief, in anticipation of a permanent injunctive hearing. Defendants disagree and submit that this court in this case has no jurisdiction or power to grant FTC's request for a temporary restraining order, a temporary injunction, or an asset freeze or other such ancillary equitable relief.

Appellants' Br. at 35–36. As we recently have made clear in addressing such a sparse argument:

Rule 28(a)(4) of the Federal Rules of Appellate Procedure mandates that an appellant must present in its brief the issues to the appellate court that the appellant desires to litigate. In addition, the issues must be supported by appropriate judicial authority. *Id.; see Coffey v. Van Dorn Iron Works,* 796 F.2d 217, 220 (7th Cir.1986); *Sanchez v. Miller,* 792 F.2d 694, 703 (7th Cir.1986), *cert. denied,* 479 U.S. 1056, 107 S.Ct. 933, 93 L.Ed.2d 984 (1987). "It is not the obli-

---

7. In light of our determination that appellants have waived this issue, the FTC's motion to strike Part IV or Appellants' Reply Brief is denied as moot.

**1026**

gation of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel." *Sanchez,* 792 F.2d at 703.

*Beard v. Whitley County REMC,* 840 F.2d 405, 408–09 (7th Cir.1988); *accord Oviawe v. INS,* 853 F.2d 1428, n. 5 (7th Cir. Aug. 10, 1988); *Zelazny v. Lyng,* 853 F.2d 540, 542 n. 1 (7th Cir.1988); *Sere v. Board of Trustees,* 852 F.2d 285, 287 (7th Cir.1988); *Duggan v. Board of Educ.,* 818 F.2d 1291, 1293 (7th Cir.1987); *Ordower v. Feldman,* 826 F.2d 1569, 1576 (7th Cir.1987); *In re Bear,* 789 F.2d 577, 579 (7th Cir.1986); *see* Fed.R.App.P. 28(a)(4). The failure to raise a matter in the opening brief is not cured by addressing the issue in the reply brief. *Coffey v. Van Dorn Iron Works,* 796 F.2d 217, 220 (7th Cir.1986). When questioned at oral argument about the waiver, the defendants' counsel stated that he believed he had used all of the pages allotted in his brief. However, the brief contained only thirty-seven pages; this is substantially under the fifty page limit permitted by the Federal Rules of Appellate Procedure. Fed.R.App.P. 28(g). In any event, a page limitation hardly justifies a departure from our consistent and evenhanded application of the waiver doctrine. *See Sere,* 852 F.2d at 287 & n. 3 (collecting cases).

The defendants' failure to raise the issue of whether the district court may grant interlocutory relief precludes their reliance upon it as an independent basis for reversal. However, the issue is central to our disposition of other issues properly before us and, with respect to those other issues, we have an independent obligation to provide a reasoned explanation for our decision. Accordingly, in order to satisfactorily explain our disposition of the other issues, we believe it appropriate to address the matter.

■ We have no reason to disagree with the conclusion of our colleagues of the Ninth and Eleventh Circuits that the authority to grant permanent injunctive relief also includes the authority to grant interlocutory relief. In addressing squarely the issue, the Ninth Circuit concluded:

Congress, when it gave the district court authority to grant a permanent injunction against violations of any provisions of law enforced by the Commission, also gave the district court authority to grant any ancillary relief necessary to accomplish complete justice because it did not limit that traditional equitable power explicitly or by necessary and inescapable inference.

*FTC v. H.N. Singer, Inc.,* 668 F.2d 1107, 1113 (9th Cir.1982); *accord FTC v. United States Oil & Gas Corp.,* 748 F.2d 1431, 1434 (11th Cir.1984) (per curiam) ("Congress did not limit the court's powers under the final proviso under section 13(b), and as a result this court's inherent equitable powers may be employed to issue a preliminary injunction, including a freeze of assets, during the pendency of an action for permanent injunctive relief."); *see also FTC v. Virginia Homes Mfg. Corp.,* 509 F.Supp. 51, 55 & n. 2 (D.Md.) (authorizing ancillary equitable relief pursuant to permanent injunction proviso of section 13(b)), *aff'd,* 661 F.2d 920 (4th Cir.1981). This court's opinion in *United States v. JS & A Group, Inc.,* 716 F.2d 451 (7th Cir.1983), is not to the contrary. As the Eleventh Circuit pointed out, cases like *JS & A Group* "affirmed the power of federal district courts to issue permanent injunctions pursuant to the final proviso of section 13(b). Preliminary injunctions were not requested and ancillary preliminary relief was not at issue. Thus, comments in those opinions concerning availability of preliminary injunction relief are dicta." *United States Oil & Gas,* 748 F.2d at 1434. In *JS & A Group,* we were not concerned with whether the proviso permitting the district court to enter permanent injunctive relief also permitted the court to grant ancillary equitable relief; we only addressed whether the FTC must commence cease-and-desist proceedings before obtaining a permanent injunction in the district court.

**B.** *Proper Case*

■ Noting that the statute gives the district court the authority to issue a permanent injunction "in proper cases," the defendants submit that this is not a "prop-

er case." In their view, a "proper case" requires a showing of fraud. On the other hand, the FTC contends that the statute does not so limit the definition of a "proper case." Although its discussion of the issue is, to put it mildly, truncated, the FTC asks us to hold that, under this clause of section 13(b), a permanent injunction may be obtained against *any* provision of law enforced by the FTC. Appellee's Br. at 47. In the alternative, the FTC argues that this case involves "routine fraud."

Our task is to ascertain the intent of Congress when it employed the term "proper cases" in the last proviso of section 13(b). Our starting point, of course, must be the language of the statute.

"If the plain language of the statute is clear, we do not look beyond those words to interpret the statute." *Indiana Port Comm'n v. Bethlehem Steel Corp.*, 835 F.2d 1207, 1210 (7th Cir.1987) (quoting *Kelly v. Wauconda Park Dist.*, 801 F.2d 269, 270 (7th Cir.1986) (citation omitted), *cert. denied*, 480 U.S. 940, 107 S.Ct. 1592, 94 L.Ed.2d 781 (1987)). We also are guided by the Supreme Court's recognition that "[i]n ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, —— U.S. ——, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988).

The term "proper case," standing alone, hardly conveys a precise description of Congress' intent. Nor can we perceive from the overall wording of the statute or from its structure the meaning of this phrase. Consequently, it is appropriate that we consult the legislative history in order to understand more completely the congressional intent.

Section 13(b) of the FTCA, 15 U.S.C. § 53(b), was originally drafted as section 210 of the Senate bill (S. 356) that ultimately led to the Magnuson–Moss Act. In turn, the Magnuson–Moss Act was enacted as part of the Trans–Alaska Pipeline Act. In the Senate report on that bill, the intent underlying the final clause of section 13(b) was explained:

This section would permit the Commission to obtain either a preliminary or permanent injunction through court procedures initiated by its own attorneys against any act or practice which is unfair or deceptive to a consumer, and thus prohibited by section 5 of the Federal Trade Commission Act. The purpose of section 210 is to permit the Commission to bring an immediate halt to unfair or deceptive acts or practices when to do so would be in the public interest. At the present time such practices might continue for several years until agency action is completed. Victimization of American consumers should not be so shielded.

Section 210 authorizes the granting of a temporary restraining order or a preliminary injunction without bond pending an issuance of a complaint by the Commission under section 5, and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final within the meaning of section 5. The test the Commission would have to meet in order to secure this injunctive relief is similar to the test it must already meet when attempting to secure an injunction against false advertising of food, drugs, devices, or cosmetics. (See 15 U.S.C. § 53(a)).

Provision is also made in section 210 for the Commission to seek, and, after hearing, for a court to grant a permanent injunction. This will allow the Commission to seek a permanent injunction when a court is reluctant to grant a temporary injunction because it cannot be assured of a [sic] early hearing on the merits. Since a permanent injunction could only be granted after such a hearing, this will assure the court of the ability to set a definite hearing date. Furthermore, the Commission will have the ability, in the routine fraud case, to merely seek a permanent injunction in those situations in which it does not desire to further expand upon the prohibitions of the Federal Trade Commission Act through the issuance of a cease-and-desist order. Commission resources will

be better utilized, and cases can be disposed of more efficiently.

S.Rep. No. 93–151, 93d Cong., 1st Sess. 30–31 (1973).

A substantial argument can be made that the statutory language, when read with this legislative history, permits the FTC to proceed under the last proviso of section 13(b) for any violation of a statute administered by the FTC. This interpretation was accepted by the district court and also has been accepted explicitly by several other courts. *See FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1086 (9th Cir.1985); *Virginia Homes Mfg. Corp.*, 509 F.Supp. at 54. However, the present case does not require that we definitively determine that such a broad interpretation of the proviso is necessary. We believe it is quite clear that Congress at least expected that the FTC could rely on this proviso when it sought to halt a straightforward violation of section 5 that required no application of the FTC's expertise to a novel regulatory issue through administrative proceedings. As the legislative history set out above makes clear, Congress' purpose in enacting section 13(b) was to protect the American consumer from activity prohibited by section 5 as quickly as possible. In the "routine fraud" case, where the nature of the deceptive practice required no extensive administrative elaboration, the FTC was empowered to seek immediate injunctive relief and to allocate its administrative resources elsewhere. Clearly, the allegations raised by the FTC, that the defendants used false and deceptive advertising to induce consumers to purchase Hawaiian vacations from World Travel, constitute a routine fraud for purposes of injunctive relief under the proviso. *See also H.N. Singer,* 668 F.2d at 1109, 1111 (finding routine fraud in case alleging "false and misleading representation" in sale of frozen pizza franchises). Accordingly, the district court properly considered this action a proper case for purposes of the last proviso of section 13(b).

## C. *The Preliminary Injunction Against the Corporate Defendants*

We begin our analysis by addressing the appropriate standard. The magistrate and the district court assumed that the appropriateness of a preliminary injunction must be determined under the traditional four-pronged test. We recently summarized this approach in *Faheem–El v. Klincar,* 841 F.2d 712 (7th Cir.1988) (en banc):

A district court must consider four factors in deciding whether a preliminary injunction should be granted. These factors are: 1) whether the plaintiff has a reasonable likelihood of success on the merits; 2) whether the plaintiff will have an adequate remedy at law or will be irreparably harmed if the injunction does not issue; 3) whether the threatened injury to the plaintiff outweighs the threatened harm an injunction may inflict on defendant; and 4) whether the granting of a preliminary injunction will disserve the public interest. *Martin v. Helstaff,* 699 F.2d 387, 389 (7th Cir.1983). Our review of a district court's decision to grant a preliminary injunction is governed by the standards set forth in *Lawson Products, Inc. v. Avnet, Inc.,* 782 F.2d 1429 (7th Cir.1986). In *Lawson* this court stated that:

factual determinations are reviewed under a clearly erroneous standard and the necessary legal conclusions are given de novo review.... However, the ultimate evaluation and balancing of equitable factors is a highly discretionary decision and one to which this court must give substantial deference.

*Id.* at 1437.

*Faheem–El,* 841 F.2d at 716–17. The defendants contend that the FTC failed to meet its burden of proof under this test. The FTC not only argues to the contrary but also suggests, albeit rather perfunctorily, that the appropriate analysis is not the traditional analysis set forth above but rather the so-called "public interest" test.

We believe that the legislative history of section 13(b) makes it quite clear that the "public interest" test is the correct approach. "The Conferees did not intend, nor do they consider it appropriate, to burden the Commission with the requirements imposed by the traditional equity standard

which the common law applies to private litigants." Conf.Rep. No. 624, 93d Cong., 1st Sess. 11 (1973), *reprinted in* 1973 U.S. Code Cong. & Admin.News 2417, 2533. *See also FTC v. Warner Communications, Inc.*, 742 F.2d 1156, 1160 (9th Cir. 1984) (per curiam); *FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1082 (D.C.Cir.1981). Under this approach, it is not necessary for the FTC to demonstrate irreparable injury. Rather, "[i]n determining whether to grant a preliminary injunction under section 13(b), a court must 1) determine the likelihood that the Commission will ultimately succeed on the merits and 2) balance the equities." *Warner Communications*, 742 F.2d at 1160. *See generally FTC v. Simeon Management Corp.*, 532 F.2d 708, 713–14 (9th Cir.1976). As we shall discuss later, in balancing those equities, while private concerns may certainly be considered, public equities must receive far greater weight. *See Warner Communications*, 742 F.2d at 1165.

## 1. Likelihood of Success on the Merits
### a. *FTCA claim*

 Section 5 of the FTCA, 15 U.S.C. § 45(a)(1), states that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." In order to establish that an act or practice is deceptive, the FTC must establish that the representations, omissions, or practices likely would mislead consumers, acting reasonably, to their detriment. *See Southwest Sunsites, Inc. v. FTC*, 785 F.2d 1431, 1435 (9th Cir.), *cert. denied*, 479 U.S. 828, 107 S.Ct. 109, 93 L.Ed.2d 58 (1986). In addition, "[m]isrepresentations of material facts made for the purpose of inducing consumers to purchase services constitute unfair or deceptive acts or practices forbidden by Section 5(a)." *FTC v. Kitco of Nevada, Inc.*, 612 F.Supp. 1282, 1291 (D.Minn.1985); *see also National Trade Pub. Serv., Inc. v. FTC*, 300 F.2d 790, 792 (8th Cir.1962). To be actionable under section 5, these misrepresentations or practices need not be made with an intent to deceive. *See Beneficial Corp. v. FTC*, 542 F.2d 611, 617 (3d Cir.1976), *cert. denied*,

430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977); *Regina Corp. v. FTC*, 322 F.2d 765, 768 (3d Cir.1963). Indeed, "[a]n advertiser's good faith does not immunize it from responsibility for its misrepresentations...." *Chrysler Corp. v. FTC*, 561 F.2d 357, 363 n. 5 (D.C.Cir.1977). Moreover, the omission of material information, even if an advertisement does not contain falsehoods, may cause the advertisement to violate section 5. *See Sterling Drug, Inc. v. FTC*, 741 F.2d 1146, 1154 (9th Cir.1984), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 143 (1985); *Katherine Gibbs School (Inc.) v. FTC*, 612 F.2d 658, 665 (2d Cir.1979). Finally, once the FTC shows (1) that a reasonably prudent person would rely on the deceptive advertisements, (2) that these advertisements were widely disseminated, and (3) that consumers purchased the product, "[t]he burden then shifts to the defendants to prove that the representations were not relied upon by the consumers." *Kitco of Nevada, Inc.*, 612 F.Supp. at 1293; *see FTC v. International Diamond Corp.*, 1982–83 Trade Cas. (CCH) ¶ 65,725 at 69,709 (N.D.Cal.1983) [1983 WL 1911].

The magistrate explicitly noted "that the $29 airfare promotion constituted the type of misrepresentation upon which a reasonably prudent person would rely, that the misrepresentations were widely disseminated, that injured customers actually purchased the product, and that the disclaimers set forth in defendants' promotional materials were insufficient to alert consumers to the true facts." Tr. of Dec. 16, 1987 at 36. On appeal, the defendants merely contend that individuals who relied on the World Travel advertisements acted unreasonably in believing that their airfare cost $29. We believe that the record supports the conclusion of the magistrate. It was quite reasonable for consumers to believe that either their airfare was free or that it cost only $29. Indeed, even one of the defendants' own witnesses "testified that she believed that she had gotten airfare for $29." *Id.* at 37. "[E]vidence that some customers actually misunderstood the thrust of the message is significant support for the finding of a tendency to mis-

lead." *Beneficial Corp.*, 542 F.2d at 617. The magistrate also found that the advertisements were widely disseminated and that several hundred thousand consumers purchased certificates from World Travel.

■ The defendants also suggest that the language in their certificate stating that "prices do not reflect actual hotel rates," was an effective disclaimer of any representation that consumers were paying only $29 for airfare. However, this language only amounts to an ambiguity in the price of the hotel accommodations. Moreover, even if we were to extend this inference to include an ambiguity in the total price of the travel package, "[t]he manner in which these ambiguities are resolved by consumers determines whether these representations are false and misleading." *Carol Sherrell Perfumers, Inc. v. Revlon, Inc.*, 483 F.Supp. 188, 194 (S.D.N.Y.1980). Here, it is obvious that numerous consumers purchased the World Travel packages thinking that they were paying merely $29 for airfare (or that the airfare was free). Moreover, as the FTC summarizes, "[i]n concluding that the claim would be relied upon (*i.e.*, was likely to deceive), the court observed that defendants had taken a number of steps to enhance the credibility of their advertisements. In other words, the advertisements and promotional materials were written so as to overcome any reservations consumers might have." Appellee's Br. at 23. For example, the defendants' advertisements set forth in detail very tenable explanations for the low price—they had purchased excess frequent flyer coupons, huge purchasing volume had enabled them to obtain big discounts, and the package was part of an airfare promotion deregulation special.

### b. *Truth in Lending Act claim*

■ Section 226.12(e)(1) of Title 12 of the Code of Federal Regulations, which was promulgated under the Truth in Lending Act, provides in relevant part:

> When a creditor other than the card issuer accepts the return of property or forgives a debt for services that is to be reflected as a credit to the consumer's credit card account, that creditor shall, within 7 business days from accepting the return or forgiving the debt, transmit a credit statement to the card issuer through the card issuer's normal channels for credit statements.

12 C.F.R. § 226.12(e)(1) (1987); *see* 15 U.S. C. § 1666(e). Accordingly, a creditor has seven business days to transmit a credit statement to the card issuer. Failure to comply with this regulation constitutes a violation of the Truth in Lending Act. *See Mourning v. Family Pub. Serv., Inc.*, 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973). Here, the magistrate concluded that "the FTC has shown a likelihood of probability of success on the merits on its Truth in Lending Act claim by virtue of the evidence, mostly from defense witnesses, that the processing of credits was routinely delayed to allow cross-checking against charge back records and for reasons relating to cash flow and the economic condition of World Travel." Tr. of Dec. 16, 1987 at 42. The record amply supports the magistrate's conclusion. Testimony given at the hearing before the magistrate from former employees of World Travel and from consumers requesting refunds from World Travel establishes that credit refunds to consumers were delayed on a regular basis.

### 2. Balancing the Equities

■ In addressing the equities of a case brought under section 13(b), we note that, "[a]lthough private equities may be considered, public equities receive far greater weight." *FTC v. Warner Communications, Inc.*, 742 F.2d 1156, 1165 (9th Cir. 1984); *see also FTC v. National Tea Co.*, 603 F.2d 694, 697 (8th Cir.1979). *See generally FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1083 (D.C.Cir.1981) ("Prior to the enactment of Section 13(b), courts weighed private equities in the balances in cases in which preliminary injunctive relief was sought to restrain an alleged statutory violation. Since Congress intended to codify that case law, we have no warrant to drop private equities from the calculus." (footnotes omitted)). The magistrate recommended that the public interest required that the defendants' allegedly illegal busi-

ness practices be enjoined to prevent further injury, and that there be a fund available for restitution of those consumers already injured. The district court issued the injunction on the basis of that recommendation. Our own review of the record reveals abundant evidence of public injury. One factor makes the point graphically. While 600,000 to 700,000 consumers purchased certificates from World Travel, only about 9500 consumers actually booked vacations to Hawaii. This great disparity certainly suggests that consumers generally did not receive the product that they had expected from reading the World Travel advertisements. Consequently, given the great weight that we must accord public interest factors and the deferential standard of review required in reviewing a district court's decision to issue a preliminary injunction,[8] we cannot disturb the district court's conclusion on this element of the preliminary injunction test.

### D. Preliminary Injunction, Including Asset Freeze, Against the Individual Defendants

We also have no doubt that the district court did not err when it made the individual defendants subject to the preliminary injunction. It is clear that the Walkers were at the center of World Travel's operation. They are the sole shareholders in World Travel; Scott Walker is the president and Carol Walker is the secretary. The Walkers also are the principal shareholders and officers of defendant C–S–K. The record shows that they directed and supervised the activities of the corporate defendants, including the advertising campaign. The FTC introduced testimony from World Travel's advertising agent that Scott Walker worked closely with the agency to formulate the challenged advertisements. Evidence also was introduced to establish that (1) the Walkers implemented and supervised the credit refund policies of World Travel, and (2) they instructed World Travel telephone operators to tell consumers that roundtrip airfare to Hawaii was only $29. Although the defendants apparently changed some of the sales scripts to satisfy several state attorneys general, those actions do not ensure that consumers throughout the nation will be protected by the deceptive advertisements. A court can require that an individual defendant do "everything in his power" to assure compliance with the law. See United States v. Johnson, 541 F.2d 710, 712–13 (8th Cir. 1976), cert. denied, 429 U.S. 1093, 97 S.Ct. 1106, 51 L.Ed.2d 539 (1977). It is evident that the individual defendants did not correct the deceptive practices entirely. Therefore, the district court properly included the Walkers individually in the scope of the preliminary injunction.

The defendants further submit that, even if it was appropriate to include them within the scope of the preliminary injunction, there was no permissible ground to justify a freeze on their assets. However, under the circumstances presented here, we believe that the district court acted within the bounds of its discretion when it froze the assets of the individual defendants.[9] The district court had determined that it was probable that the FTC would prevail in a final determination of the merits. Restitution would therefore be an appropriate remedy at the conclusion of the proceedings. Therefore, the district court had a duty to ensure that the assets of the corporate defendants were available to make restitution to the injured customers. The record disclosed that there had been a good deal of shifting of assets from World Travel to the individual defendants. Moreover, because neither the individual nor corporate defendants have complied with the court's order to disclose relevant financial information, it is extremely difficult to discern if a less drastic remedy would have been appropriate.

**8.** See Lawson Products v. Avnet, Inc., 782 F.2d 1429, 1437 (7th Cir.1986).

**9.** Asset freezes have been granted in other section 13(b) cases. See, e.g., FTC v. American Nat'l Cellular, Inc., 810 F.2d 1511, 1514 (9th Cir.1987); FTC v. United States Oil & Gas, 748 F.2d 1431, 1432 (11th Cir.1984); FTC v. H.N. Singer, Inc., 668 F.2d 1107, 1112–13 (9th Cir. 1982).

The defendants also make a more specific objection to the asset freeze. They submit that the freeze violates their fifth and sixth amendment rights because it prevents their continued retention of counsel of their choice. Consequently, they continue, they are hampered in the presentation of their case. However, as the FTC points out, the district court has already released $125,000 for the payment of counsel, an amount that defendants' own counsel described as "a fair cap" for attorneys' fees. Additionally, $50,000 has been released for litigation expenses. On the record before us [10] therefore, defendants' arguments are decidedly premature.

 The defendants attempt to present one additional constitutional argument with respect to the asset freeze. Noting that it is likely that the government will file criminal charges against Scott Walker, the individual defendants raised, in the district court, a fifth amendment self-incrimination issue with respect to the district court's order that they produce financial records. Before this court, as we have noted, they have raised a fifth amendment due process issue with respect to the impact of the asset freeze on their ability to employ counsel. However, they did not repeat the self-incrimination issue raised in the district court. After the district court refused to release additional funds for attorneys' fees and expenses, *see supra* note 10, the defendants submitted to this court authority "for the proposition that the District Court's Order requiring Defendant Scott Walker to file a financial statement under seal is a direct violation of his constitutional rights under the Fifth Amendment of the United States Constitution." Letter from defendants' counsel to Clerk of Seventh Circuit (June 9, 1988) (citing *In re Grand Jury Subpoena*, 836 F.2d 1468 (4th Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 2914, 101 L.Ed.2d 945 (1988)). *See Pillsbury Co. v. Conboy*, 459 U.S. 248, 103 S.Ct. 608, 74 L.Ed.2d 430 (1983) (absent grant of immunity, individual may assert fifth amendment privilege against self-incrimination in civil proceeding). However, because neither Mr. Walker nor any other defendant raised a fifth amendment self-incrimination claim in the opening brief before this court, the issue is waived. Even if waiver were inapplicable here, we note that only Mr. Walker asserts a fifth amendment right against self-incrimination; indeed, the corporate defendants could not raise such a privilege. Moreover, the matter is decidedly premature. If the corporate defendants had produced the ordered financial documents, the district court might have had a sufficient basis to lift the individual asset freeze. Accordingly, even if the claim had been raised in a timely fashion, we would not need to decide if Mr. Walker's claim has merit. Until the corporate defendants submit the proper records to the district court, and the court refuses to lift the freeze, Mr. Walker's self-incrimination claim is premature for our adjudication.

### Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED.

---

10. The defendants claim they now have exhausted the entire amount unfrozen for litigation expenses and attorneys' fees. On February 4, 1988, the magistrate denied the defendants' motion to release further monies. The district court subsequently denied the same motion in an order dated June 1, 1988:

As of the date of this order, defendants' completed financial statements have not been filed. FTC argues that until defendants make the ordered financial disclosures, this court is unable to ascertain whether defendants have sufficient independent funds to pay their attorneys. This court agrees. Over eight months have passed since defendants were ordered to produce comprehensive financial statements. Defendants' "foot-dragging" will not be tolerated. No requests for additional attorneys' fees will be considered until full financial disclosure is made.

*FTC v. World Travel Vacation Brokers, Inc.*, No. 87 C 8449 (N.D.Ill. June 1, 1988) (order); R. 232.

Defendants-appellants' motion for release of funds filed in this court while the above motion was pending in the district court is denied.