**FEDERAL TRADE COMMISSION,**
**Plaintiff,**

v.

**Jacqueline SABAL, a.k.a. Jacqueline**
**Sable, Defendant.**

No. 98 C 170.

United States District Court,
N.D. Illinois,
Eastern Division.

July 23, 1998.

Theresa M. McGrew, Russell W. Damtoft, Assistant Regional Director, Chicago, IL, Federal Trade Commission, Chicago, IL, for Federal Trade Commission, plaintiff.

Dennis C. Waldon, Lavin & Waldon, P.C., Chicago, IL, Stuart Wilson Opdycke, Rosenberg & Opdycke, Chicago, IL, for Jacqueline Sabal, defendant.

## MEMORANDUM OPINION AND ORDER

LINDBERG, District Judge.

Jacqueline Sabal is engaged in the manufacture and sale of a line of topical hair loss products known as the "hair farming" system. The Federal Trade Commission filed a complaint against her alleging that she has made numerous false and misleading representations about these products in violation of section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a). The FTC currently seeks a preliminary injunction freezing Sabal's assets and barring her from advertising and selling her hair farming products pending the resolution of this suit. For the following reasons, plaintiff's motion with be granted.

### I. *Factual Background*

Jacqueline Sabal is the creator and manufacturer of a line of over-the-counter topical hair loss products known as the hair farming system. She claims that these products work by cleaning out congested pores and allowing hair to escape that would otherwise be trapped beneath the scalp. Her hair farming products appear under such trade names as Foli–Kleen 2000 Formula I Topical Scalp Cleanser, Foli–Kleen 2000 Formula II Deep Scalp Cleanser, Foli–Kleen 2001 Shampoo, and Hairful Shampoo. She has acted through a variety of corporate instruments including Contessa Basile, Contessa Cosmetics, and Sable Laboratories. Sabal is currently a resident of Florida.[1]

In June of 1993, Sabal entered into an exclusive marketing agreement with a company called Mega Systems, Inc. to advertise her hair farming products on a nationally broadcast radio infomercial with Kevin Trudeau. During the infomercial, Sabal stated that her hair farming products "can deep clean underneath the surface of the scalp, and clean out all the debris that prevents the hair or blocks the hair from reaching the surface." (Pl.Exh. 12, Att. B at 3.) She further stated as follows:

> [T]he amazing thing that was happening is that after we cleaned, as we looked at the scalp, hair sprouted out. And right in front of our eyes. And when I saw that happen, I said, "Gee, this is just like farming." [Id. at 6.] ... [It works b]ecause the hair is there. Again, we're not growing hair. And the hair that sprouts out measures five years, for instance, [showing] that it's been growing under the scalp, from the blood, from the protein in the blood. And we've actually proved that even more so, because we had cadaver scalps dissected, and there's the hair trapped in the follicles. And then we went further than that, and we had live subjects tested in a laboratory here in south Florida, and they counted the hairs as they came in on every test subject every day that they used the product. [Id. at 7.] ...

So we have a wonderful product that cleans the scalp. And if you learn to do that, first of all, you'll never lose your hair.... I have a right to this theory, whether the medical community believes me or not, although they soon will because I'll be written up in most of the major

---

1. In her promotional materials, Sabal spells her last name as "Sable" and sometimes refers to herself as "The Hair Lady." She further identifies herself as a descendant of Count Giovanni Batista Basile, Count of Tyrone, an individual she describes as the "Count of Fairy Tales." For this she claims the title of Contessa Jacqueline Sable de Bastile. (Pl.Exh. 12, Att. C at 1, Att. D at 134–136.)

medical journals around the world.... I should be in most of the major medical journals in the world in the next few months, which will finally end baldness in the human race. [Id. at 8.] ...

It's guaranteed to work on every human being. [Id. at 9.] ... And everyone should have their hair back in six months to a year, permanently, painlessly, and never have to purchase anything again. [Id. at 10.] ...

Well, the doctors that have tested with us, that amazed them.... They said they saw more in five minutes with our product than they did with any other product they've ever tested. And that includes the Rogaine and Minoxidil products. [Id. at 18–19.] ... You want to see the doctors' expressions. The condescending look when I walk into their office. And then their expression and the jaw that drops when they [see] 10–inch–long hairs popping out of a totally old, bald man. [Id. at 27.]

This infomercial was broadcast more than nine hundred times between June and December of 1993. From January of 1994 through September of 1996, Sabal earned gross profits of more than $2.4 million on the sale of hair farming products. (Damtoft Dec. at 2.)

In 1994, Sabal published a seventy-two page book about her product called "As the Hair Falls." (Pl.Exh.12, Att.D.) In it, she repeats her claims about the connection between hair loss and clogged follicles. (Pl. Exh. 12, Att. D at 143.) The book explains that hair loss is caused in part by the collection of oily fluids in various places on the scalp and, accordingly, that patterns of hair loss are determined by the shape of the head. (Pl.Exh. 12, Att. D. at 145–150.) The book also speculates about the connection between hair loss, diet, and nationality, to wit: "The Indian, Asian and Black Races, have very little hair on their body or facial hair, whereas the Caucasian Race have hair on their body and facial hair, and are more pre-determined to hair loss. It is therefore possible that the foods we eat, the menus we are

brought up to follow, have a great deal to do with hair loss." (Pl.Exh. 12, Att. D at 158–159.)

In late 1997, Sabal contacted a web page designer named Deborah Doerrlamm in order to begin marketing her products on the internet. Using materials provided by Sabal, Doerrlamm created two web pages and posted them on the internet on December 15, 1997. These sites informed on-line visitors that Foli–Kleen 2000 had been tested and proven effective and guaranteed them that they would see a "noticeable difference" within the first month of the hair farming program. (Pl.Exh. 6, Att. A at 11; Att. B. at 1, 2.) In a list of selling points, the web site suggested that the hair farming products were guaranteed to produce permanent results and were supported by a wide variety of tests and studies. (Pl.Exh. 6, Att. B at 9.) It further stated that a preliminary double-blind study conducted by an independent laboratory had demonstrated that the use of hair farming products resulted in a ten percent increase in hair counts each month. (Pl.Exh. 6, Att. B at 13.) Doerrlamm closed the internet sites on May 8, 1998 after learning that Sabal was the subject of a state investigation in Florida. (Doerrlamm Aff. at 5.)[2]

While it was active, the internet site invited people to become local distributors of hair farming products by purchasing 1000 one-month supply kits at prices of up to $65.00 per kit. (Pl.Exh. 6, Att. A at 23, Att. G at 3.) The other hair farming products listed on the web site ranged in price from $12.95 for an eight-ounce bottle of 2001 Shampoo to $159.95 for a Premier Kit containing four sixteen-ounce bottles and one eight-ounce bottle. (Pl.Exh. 6, Att. B at 5.) An introductory kit containing one month's supply of Foli–Kleen 2000 Formulas I and II, Foli–Kleen 2001 daily shampoos, a soft bristle brush and instructional materials was offered for $99.95. (Pl.Exh. 6, Att. B at 2; Pl.Exh. 12, Att. C at 13.) Sabal's monograph "As the Hair Falls" drew only $6.95. (Pl.Exh. 6, Att. B at 5.)

---

**2.** In January of 1998, Sabal told Doerrlamm that she wanted to market her hair farming products to Asians under the label "Geni Bloom" as way to increase the growth of genital hair. When she asked Doerrlamm to design an advertisement that could be posted on pornographic web sites, Doerrlamm declined. (Doerrlamm Aff. at 4.)

Sabal has received a number of official warnings over the years that her claims about hair farming are deceptive. In 1985, the San Francisco Regional Office of the FTC opened an investigation of Sabal based on her claims about a hair farming product called "Hair Today." The FTC ultimately closed the investigation when Sabal's company went bankrupt and she stated through counsel that she would cease making the disputed claims. (Damtoft Dec. at 1–2.) In 1991, the FDA warned her to discontinue the sale of her hair farming products because they were in violation of the agency's regulations. (Chang Dec. at 3–4.) On May 29, 1997, after conducting a two year investigation, Florida Attorney General Robert R. Julian filed a civil complaint against Sabal seeking to enjoin her from making further misrepresentations about the effectiveness of her products. On the same day, the State's Attorney's Office of Broward County, Florida filed a criminal complaint against Sabal and briefly took her into custody. (Julian Dec. at 1.)

In 1996, the Chicago Regional Office of the FTC launched an investigation of Sabal in connection with a series of actions against marketers of self-help and health-related products promoted through radio and television infomercials. The FTC was able to reach consent agreements with each of the respondents but Sabal. After concluding that Sabal would not enter into a consent, the FTC filed the instant complaint against her on January 12, 1998. (Damtoft Dec. at 2–4.) Sable has continued to advertise and sell her hair farming products as recently as May of 1998. (Julian Dec. at 2–3.)

## II. Discussion

Section 13(b) of the Federal Trade Commission Act authorizes the federal district courts to enjoin unfair and deceptive acts of commerce "[u]pon a proper showing that, weighing the equities and considering the FTC's likelihood of ultimate success, such action would be in the public interest." 15 U.S.C. § 53(b). The Seventh Circuit has explained that under this two-pronged test, the "greater the plaintiff's likelihood of success on the merits ... the less harm from denial of the preliminary injunction the plaintiff need show in relation to the harm that the defendant will suffer if the preliminary injunction is granted." *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 903 (7th Cir.1989). Because this test presumes irreparable harm to the public, it differs somewhat from the traditional four-pronged standard for the issuance of preliminary injunctions in cases between private litigants. *See FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1028–1029 (7th Cir.1988).

### A. Likelihood of Success on the Merits

Section 5(a) of the Federal Trade Commission Act prohibits "unfair and deceptive acts and practices in or affecting commerce." 15 U.S.C. § 45(a) An advertisement is deceptive if it contains material misrepresentations or omissions that are likely to mislead consumers acting reasonably under the circumstances. *Kraft, Inc. v. FTC*, 970 F.2d 311, 314 (7th Cir.1992). A misrepresentation is material if it contains information that is important to consumers and is likely to affect their decision about whether to purchase a product. *Kraft*, 970 F.2d at 322. Because the statute does not require an intent to deceive, the subjective good faith of the advertiser is not a valid defense to an enforcement action brought under section 5(a). *World Travel*, 861 F.2d at 1029.

The FTC may show that an advertisement is deceptive either by proving its falsity or by showing that its proponent lacked a reasonable basis for asserting its truth. *See FTC v. Pantron I Corp.*, 33 F.3d 1088, 1096 (9th Cir.1994); *see also FTC v. U.S. Sales Corp.*, 785 F.Supp. 737, 748 (N.D.Ill.1992), *citing Thompson Medical Co. v. FTC*, 791 F.2d 189, 193–194 (D.C.Cir.1986). If, as here, the FTC takes the latter course, then the court must first ascertain the appropriate level of substantiation for the disputed claims and then determine whether it was met. *Pantron I*, 33 F.3d at 1096. The FTC contends that all claims about the effectiveness of over-the-counter hair loss products must be supported by "[v]alid scientific evidence, including well-controlled, double-blind clinical tests" in order to prevent "subjective and biased reporting by users or observers." *FTC v. California Pacific Research, Inc.*, 1991 WL 208470, at *4 (D.Nev.1991); *see*

*also Pantron I,* 33 F.3d at 1096 n. 23 (explaining in dicta that clinical studies are necessary to substantiate advertising claims about hair loss products). Defendant raises no objection to this test for substantiation.[3]

The FTC contends that Sabal has not substantiated her claims that (1) hair farming products promote hair growth and prevent hair loss, (2) hair farming products are superior to Rogaine and Minoxidil, and (3) hair farming products have been proven effective in scientific studies. In her two page response to the motion for a preliminary injunction, Sabal argues that she made "legitimate good faith efforts to determine the efficacy of her products." (Def.'s Resp. at 1.) She cites two studies which, she claims, show that the prescribed use of hair farming products leads to "an increased amount of hair on scalps where none was previously apparent." (*Id.*) Sabal contends that these tests establish her bona fides even if they are "not as controlled as plaintiff's experts suggest are required under FDA guidelines." (Def.'s Resp. at 2.)

The first "study" proffered by Sabal summarizes the results of a clinical trial of Foli–Kleen 2000 conducted in the spring of 1994 by Dr. Martin Rosenberg at AMA Laboratories in New York City. Purportedly, the study was a double-blind and placebo-controlled evaluation of sixteen male and female subjects over a three month period of time. Each month, the test participants were subjected to hair counts, photographs, personal questionnaires, and dermatological evaluations. The report states that at the conclusion of the study the Foli–Kleen 2000 users showed an increase in hair counts of 33.9 percent and that the placebo users showed an increase of only 11.6 percent. (Def.Exh.A.)

FTC expert Dr. Janis Pappalardo reviewed the Rosenberg study and concluded that it was inadequate to support Sabal's claims. Pointing out that the study was neither published nor peer reviewed, she explained that Rosenberg's summary was inadequate to permit a thorough review of his research methods or independent verification of his test results. She pointed out that the report did not contain sufficient data from which it could be determined that the results were statistically significant, did not explain how the control groups differed by age and gender, and did not describe the treatment regime. Moreover, the report did not include the photographs and did not report the results of the dermatological evaluations and personal questionnaires. (Supp. Pappalardo Dec. at 2–3.)

The second report was a 1992 letter from a dermatologist in New York City named Dr. Robert A. Berger. Berger explained that he observed twenty-three men with male pattern baldness undergo treatment with two unspecified Sable Laboratories hair solutions. After the treatments, he observed that the "great majority" of the subjects had "several" longer hairs near the margins of their balding areas. While recognizing that he might simply have overlooked the longer hairs prior to the treatments, Berger concluded that it was "possible" that the hairs were "trapped within the follicle and freed up by the cleansing effect of [Sabal's] procedure." (Def.Exh.B.)

Pappalardo explained that the Berger study was inadequate because it did not explain how the sample was selected, did not state how many subjects had longer hair or how much longer their hair was, did not state whether they had any new hair, did not include a placebo control group, was not blind, and contained no information to determine whether the results were statistically significant. (Pappalardo Dec. at 7–8.) The court adds that Berger study did not specify which hair farming products were used and

---

3. The requirement that hair loss remedies be supported by valid scientific evidence is consistent with FDA regulations. The FDA Final Monograph on Hair Grower and Hair Loss Prevention Drug Products for OTC Human Use states that "[a]ny OTC drug product that is labeled, represented, or promoted for external use as a hair grower or for hair loss prevention is regarded as a new drug ... for which an approved new drug application under section 505 of the act and part 314 of this chapter is required for marketing." 21 C.F.R. § 310.527(b). Section 314 specifies that new drug applications must be supported by well-controlled clinical studies. 21 C.F.R. § 314.126. *See also California Pacific Research,* 1991 WL 208470 at *4 (requirement of valid scientific evidence reflects the consensus of the scientific community and is consistent with position taken by FDA).

did not reach an unqualified conclusion that Sabal's theory of hair growth was correct.

■ Sabal contends that these studies establish her subjective good faith even if they do not meet FDA guidelines. As noted above, this argument is misplaced because good faith is not a valid defense to a claim brought under section 5(a) of the Federal Trade Commission Act. *FTC v. NCH*, 1995 WL 623260, at *6 (D.Nev.1995), *citing World Travel*, 861 F.2d at 1029. In view of the extravagant claims that Sabal has made about her products, however, and the repeated warnings that she has received from various law enforcement agencies, the court does not agree that these studies are indicative of good faith.

The court finds that neither the Rosenberg nor the Berger reports substantiate any of Sabal's disputed claims about hair farming. For the reasons set forth above, the studies do not constitute valid scientific evidence that any of Sabal's hair farming products actually work. Beyond this, the tests do not show that people have hair growing under their scalps, that there is any relationship between hair loss and head shape, or that the use of hair farming products can produce a complete and permanent restoration of hair in every human being. Nor do they compare hair farming products to Rogaine or Minoxidil. Moreover, the FDA has reviewed Sabal's products and concluded that they are not in compliance with its rigorous testing regulations. (Chang Dec. at 3–5.) Accordingly, the court finds that Sabal has failed to produce any reasonable substantiation for the claims that hair farming products promote hair regrowth and prevent hair loss, are superior to Rogaine and Minoxidil, and have been proven effective in scientific studies.

The FTC argues that these misrepresentations were material because they induced consumers to spend large quantities of money on them, and Sabal does not dispute the point. The court agrees that Sabal would have been unable to command such high prices for her hair farming products but for her representations that they were able to restore lost hair, were superior to Rogaine and Minoxidil, and were supported by scientific evidence. For these reasons, the court finds that the FTC has demonstrated a likelihood of success on the merits of its claim that Sabal has engaged in material misrepresentations of fact about her hair farming products as alleged by the FTC.

### 2. *Balancing of equities*

■ The balance of the equities in this case favors the issuance of a preliminary injunction freezing Sabal's assets and barring her from engaging in the marketing or sale of hair farming products pending the outcome of this suit. Although the court may consider private equities in a case brought under section 13(b), public equities receive far greater weight. *World Travel*, 861 F.2d at 1029. In this case, the court believes that the public has a strong interest in preventing the marketing and sale of hair farming products and in preventing the dissipation of assets that may be necessary to provide restitution. Sabal, by contrast, has no legitimate interest in continuing to make false and misleading claims about her product. *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir.1989) ("[T]here is no oppressive hardship to defendants in requiring them to comply with the FTC Act, refrain from fraudulent representation or preserve assets from dissipation or concealment"). That the equities favor the issuance of a preliminary injunction in this case is all the more certain in light of the fact that the FTC has demonstrated a strong likelihood of success on the merits of its claim. *Elders Grain*, 868 F.2d at 903. Because Sabal raises no particular objections to the scope of the proposed order for a preliminary injunction, the court will enter the order as presented.

### III. *Conclusion*

The court finds that the FTC has demonstrated a likelihood of success on the merits of its claim that defendant Jacqueline Sabal has made false and misleading claims about her line of hair farming products. The court also finds that the balance of the equities favors the entry of a preliminary injunction freezing her assets and barring her from advertising and selling her products pending the outcome of this litigation.

ORDERED: Plaintiff's motion for a preliminary injunction and asset freeze is granted. Enter order.