FEDERAL TRADE COMMISSION,
Plaintiff,

v.

US SALES CORPORATION, also d/b/a
Data Resource Systems,

and

Dean S. Vlahos, individually and as an
officer and director of US Sales
Corporation, Defendants.

No. 91 C 3893.

United States District Court,
N.D. Illinois, E.D.

Feb. 3, 1992.

Thomas J. Russell, Catherine R. Fuller, John Campbell Hallerud, Karen D. Dodge, F.T.C., Asst. Regional Director, Chicago, Ill., for plaintiff.

Joel S. Feldman, Sachnoff & Weaver, Ltd., Stephanie Wenkert Kanwit, Jerome S. Lamet, Lamet, Kanwit & Davis, Lawrence Andrew Brehm, Schuyler, Roche & Zwirner, Chicago, Ill., for defendants.

MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

The Federal Trade Commission (FTC) brought action under § 13(b) of the Federal Trade Commission Act (FTC Act), 15 U.S.C. § 53(b), to secure preliminary and permanent injunctive relief and restitution for Defendants' allegedly unfair and deceptive acts and practices. The FTC claims that certain of Defendants' acts and practices violate § 5(a) of the FTC Act, 15 U.S.C. § 45(a). The FTC now seeks summary judgment on Counts II and III of its complaint.

### Background

The US Sales Corporation, also doing business as Data Resource System and Surplus Distribution, Inc., was incorporated in Connecticut in October, 1988. Dean S. Vlahos is the sole shareholder, President and director of the US Sales Corporation which did not become active until January 1, 1991. Prior to that date, Vlahos operated his business as a sole proprietorship. He remains intimately involved in the operations of the US Sales Corporation.

One area of business for US Sales and Vlahos is selling information about how to purchase repossessed or forfeited cars at government auctions. A second area is selling information about how to obtain secured credit cards. The FTC, in Counts II and III, charges that the defendants have engaged in unfair and deceptive practices in promoting those areas of business.

### A. Hot Cars

The defendants advertised the automobile auction information service on both radio and television. The advertisements encouraged listeners and viewers to call a 900 number (1-900-HOT-CARS) for information regarding government auctions of automobiles.

The script for US Sales' "Hot Cars" radio advertisement was as follows:

THINKING OF BUYING A RED HOT CAR? DID YOU KNOW THAT YOU CAN FIND CARS, TRUCKS AND

VANS, RIGHT NOW FOR HOT PRICES.... AS LITTLE AS ... $100—?

THAT'S RIGHT ... RED HOT CARS IN GOOD CONDITION, RIGHT NOW FOR AS LITTLE AS.... $100—!

EVERY SINGLE DAY, SPECIAL HOT LIQUIDATION SALES ARE SELLING CARS, TRUCKS AND VANS IN YOUR AREA AT PRICES SO LOW THEY'RE PRACTICALLY GIVING THEM AWAY!

THESE HOT CARS WERE CONFISCATED IN DRUG SEIZURES, USED BY GOVERNMENT AGENTS, OR REPOSSESSED BY BANKS ... AND THEY'RE BEING SOLD TODAY FOR AS LITTLE AS ... $100.

FIND OUT WHERE TODAY'S HOT SALES ARE, BY CALLING 1 900 HOT CARS.... ONLY $2 A MINUTE.... YOU KNOW, THIS CAN BE YOUR CHANCE TO MAKE MONEY TOO.... FIND ANYTHING FROM A FAMILY CAR TO A RED HOT FERRARI AND GET IT AT TREMENDOUS SAVINGS.... OR SELL IT AT HUGE PROFITS. REMEMBER, THERE ARE SALES GOING ON TODAY! TO FIND OUT WHERE, CALL 1 900 HOT CARS..:. THAT'S 1–900 H–O–T C–A–R–S ... CALL 1–900 HOT CARS RIGHT NOW!

The audio portion of television advertisements [1] utilized by US Sales for its 1–900–HOT–CARS telephone number stated:

THINKING ABOUT BUYING A CAR, FROM A FORD TO A RED HOT FERRARI, YOU CAN NOW BUY CARS, TRUCKS AND VANS IN GOOD CONDITION FOR HOT PRICES, AS LOW AS $100. JUST CALL, 1–900–HOT–CARS AND FIND OUT WHERE TO BUY CARS FOR AS LITTLE AS $100. CARS, REPOSSESSED BY BANKS, CONFISCATED AND USED BY GOVERNMENT AGENTS, ARE BEING SOLD TODAY AND EVERY DAY NEARBY FOR HOT PRICES, AS LOW AS $100. FIND TODAY'S HOT DEALS. CALL 1–900–HOT–CARS TO FIND OUT WHERE, 1–900–HOT–CARS, CALL NOW.

The video portion of the television commercials showed pictures of sports cars and late model cars, including a Jaguar, a Mustang, a Thunderbird, a Ferrari and a Corvette. The pictured automobiles all appeared to be brand new and in marvelous condition. In "fine print" appearing at the bottom of the television screen during the closing seconds of the commercial, a disclaimer was flashed stating that the cars shown are "for illustration purposes." The disclaimer is extremely difficult to read as it is flashed on the screen quickly in small print. It was also only one line out of four lines of disclaimers at the bottom of the screen. The court was able to read the disclaimer only after numerous viewings of the commercial and after "pausing" the videotape. The FTC has also offered the affidavit of Tanisha Moore who experienced similar difficulty in reading the "fine print" disclaimers of the 1–900–HOT–CARS television advertisement.

In addition, various aspects of the commercial stress the price $100. Every time

---

1. The FTC designated the commercial as a representative television commercial in its 12(m) Statement of Material Uncontested Facts. Defendants stated in their 12(n) Response that they did not know what was meant by "representative" and therefore denied that the advertisement was representative. The defendants did admit that the text of the commercial was used. From context, it is clear that "representative" means that the television commercial here is similar in all material respects to other television commercials for 900–HOT–CARS. Indeed, Exhibit 4 of the FTC's Exhibits in Support of its Memorandum For a T.R.O. is a videocassette featuring five different commercials for 1–900–HOT–CARS. The audio portions of the five commercials were identical except that one of the commercials also stated briefly that callers would be charged two dollars per minute. There were also immaterial variations among the five commercials with respect to what was included in the "fine print" at the bottom of the screen in the closing seconds of the commercial. In three of the five commercials "$2/min." appeared above three lines of "fine print" while in two of the five commercials, it appeared somewhat less conspicuously below the three lines of "fine print." Some of the commercials had more included in the "fine print" than others, such as the statement "Must be 18 or older to call" and text identifying the sponsoring company as US Sales.

the commercial says "AS LOW AS" or "AS LITTLE AS $100," the screen turns black and $100 appears in big red letters. Meanwhile, the audio portion of the commercial undergoes a change in voice. While an excited, fast-speaking voice narrates the bulk of the commercial, when "$100" is spoken, a calm deep voice takes over and says "ONE HUNDRED DOLLARS" slowly and deliberately. These advertising devices had the effect of emphasizing the message that the beautiful cars pictured can be acquired for a small fraction of their market value, if not literally for one hundred dollars.

The HOT CARS recorded message was periodically updated to remain current. The FTC has offered transcripts of the messages recorded on December 18, 1989 and January 9, 1991.

Those who called the 900–HOT–CARS number were first advised that the recorded announcement would provide locations of auctions throughout the United States. The announcement then told the callers that if they waited until the end of the recorded message, they would be given a special toll free 800 telephone number to call for further information. On December 18, 1989, the announcement promised that the special 800 number would advise callers on auctions in their particular area.

The recorded message on December 18, 1990 informed callers about auctions being held in fifteen different locations around the country (in Virginia, Washington, D.C., Maryland, Michigan, Ohio, New York and California) and the recorded message on January 9, 1991 provided information about auctions in three locations (New York, Chicago and Los Angeles).

Consumers induced by the radio and television advertisements who called 1–900–HOT–CARS paid two dollars a minute while they heard a recorded message. The radio advertisement declares that the cost of the call is two dollars per minute; the television advertisement presented that information in writing on the screen.[2] Those who called the 900 number and waited until the end of the recorded message to obtain the "special toll free" 800 number spent twelve minutes on the line and were charged $24.00.

Patient callers who waited until the end of the recorded message were indeed given an 800 number. Upon calling that 800 number, callers would speak to a live US Sales operator who would answer questions that the callers might have, such as questions concerning automobile auctions generally, questions regarding specific automobile auctions, and questions concerning such matters as how to get to a particular auction. The live operator might on occasion also inform callers of additional upcoming auctions not included in the recorded HOT CARS message.

The main purpose of the 800 number, however, was not to provide additional information to callers of the 900 HOT CARS number. Those who called the 800 number were solicited to purchase lifetime memberships in US Sales for $99.95. Purchasers of lifetime memberships in US Sales were entitled to receive, free of charge on an ongoing basis for the rest of their lives, information concerning additional automobile auctions. Members of US Sales also received a variety of other benefits.

### B. *Secured Credit*

In 1990, Defendants began advertising a secured credit card on both radio and television. The advertisements encouraged listeners and viewers to call a 900 number to obtain a secured credit card.

The radio advertisement for 1–900–VISA–123 stated:

> HAVE YOU BEEN TURNED DOWN FOR A VISA OR MASTERCARD?
>
> DO YOU HAVE BAD CREDIT?
>
> WELL EVEN IF YOU'VE DECLARED BANKRUPTCY, NOW YOU TOO CAN OWN YOUR OWN SECURED VISA OR MASTERCARD, REGARDLESS OF YOUR CREDIT HISTORY!
>
> IT'S AS EASY AS 1–2–3!

---

**2.** Count III of the FTC's complaint charges that the warning that calls to the 900 number was not displayed prominently enough. The FTC has not sought summary judgment for count III.

JUST CALL 1–900–VISA 123 TO FIND OUT HOW YOU CAN RECEIVE YOUR OWN SECURED VISA OR MASTER-CARD TODAY! ONLY THREE DOLLARS PER MINUTE.

IT'S TRUE! NOW, YOU TO [sic] CAN OWN A VISA OR MASTERCARD!, REGARDLESS OF YOUR CREDIT HISTORY!

WOULDN'T YOU LIKE TO ENJOY THE GOOD LIFE WITH YOUR OWN VISA OR MASTERCARD?

IT'S SIMPLE AS 1–2–3!

JUST CALL 1–900–VISA 123 FOR INFORMATION ON HOW YOU CAN RECEIVE YOUR OWN SECURED VISA OR MASTERCARD, EVEN IF YOU'VE BEEN TURNED DOWN BEFORE!, EVEN IF YOU'VE NEVER HAD A CREDIT CARD, YOU TOO CAN BE ACCEPTED!

JUST CALL 1–900–VISA–123! ONLY THREE DOLLARS PER MINUTE. THAT'S 1–900–VISA–123!

CALL TODAY, AND YOU CAN HAVE THE VISA OR MASTERCARD YOU'VE ALWAYS WANTED AS EASY AS 1–2–3!

THAT'S 1–900–VISA 123! ADDITIONAL FEES MAY APPLY.

CALL TODAY! 1–900–VISA 123, NOW!

The audio portion of Defendants' television commercial stated:

HAVE YOU BEEN TURNED DOWN FOR A CREDIT CARD? WELL, EVEN IF YOU HAVE NO CREDIT OR BAD CREDIT, NO PROBLEM! NOW, YOU CAN OWN YOUR OWN SECURED VISA CARD REGARDLESS OF YOUR CREDIT HISTORY AND IT'S AS EASY AS ONE, TWO, THREE. JUST CALL

1–900–VISA–123. ENJOY THE GOOD LIFE WITH YOUR OWN SECURED VISA CARD. GOOD UP TO $5,000. YOU WILL NOT BE TURNED DOWN. CALL 1–900–VISA–123, NOW. 1–900–VISA–123.[3]

The video portion of the television commercial emphasized that consumers would not be turned down regardless of their credit histories. The words "Regardless of Your Credit History" appeared in bold yellow letters against a bright blue background.[4]

The radio and television commercials also did not explain what a secured credit card is. A secured credit card is a credit card issued by a bank that is secured by the amount of funds on deposit in a savings account at that same bank. A cardholder's credit limit is equal to the amount of funds on deposit in his or her savings account at the issuing bank.

Consumers who were induced by Defendants' advertisements to call one of the 900 numbers were charged three dollars per minute as they reached a recorded message. The actual amount they were charged depended on how long they stayed on the line. One caller who stayed on the line until the end was charged $33.27. See Affidavit of Brad Wilson.

The recorded message begins by repeating the claims that even with no credit or bad credit, callers can obtain a secured Visa or Mastercard. The FTC has offered transcripts of three of Defendants' recorded messages for their 900 VISA numbers. The text of two of the three recorded messages began as follows:

Thank you for calling the secured credit card hotline! In this recording you'll

---

**3.** Exhibit 4 to the *Exhibits in Support of the Temporary Restraining Order* is a videotape with three complete television commercials for 1–900–VISA–123. The audio portions of the three commercials are identical except that one of them also informs viewers that the cost of the call is three dollars per minute.

**4.** The video portions of the three 1–900–VISA–123 television commercials were identical except for minor and immaterial variations in the "fine print" disclosures appearing at the bottom of the screen in the final seconds of the com-

mercial. The court had tremendous difficulty in reading the fine print. As with the television commercial for 1–900–HOT–CARS, the court was able to read the "fine print" disclosures only after viewing the commercials repeatedly and "pausing" the videotape. The disclaimers stated that some restrictions may apply and that a security deposit and additional fees may be required. Tanisha Moore, whose affidavit was introduced by the F.T.C., had similar difficulties in reading the "fine print" in Defendants' 1–900–VISA–123 television ads.

find out where you can get a secured Visa or Mastercard, at many banks throughout the United States, even if you have No Credit, or Bad Credit! It's no problem.

All three of the recorded messages state the following early on:

If you have been denied a credit card because you have bad credit, this information is for you! Even if you've been turned down before, you too can own a secured visa or mastercard! And, at the end of this recording you'll be given a toll free 800 telephone number, to reach a live US Sales operator for assistance with the information you are about to hear on these bank's [sic] programs.

Callers would then be given the names and addresses of a variety of banks to which callers could write for a VISA or Mastercard application. Two of the transcribed messages listed nine banks and the other message listed five banks. Periodically, between listing banks, the message would encourage callers to stay on the line until the end in order to obtain the "important" 800 number.

In fact, however, the banks identified by defendants in the recordings *do* consider the credit history of applicants for secured credit cards. Contrary to Defendants' express representations, applicants were frequently denied secured credit cards based on their credit histories.

The affidavits of officers of nine of the banks mentioned in the recording are included in the record. The nine officers all aver that their banks review the credit histories of applicants for secured credit cards and that their banks will deny applications on the basis of poor credit histories. The banks typically also look to other indicia of creditworthiness such as outstanding levies from the Internal Revenue Service and whether the applicant has filed bankruptcy recently. Certain of the banks require that applicants have income above a certain level and they all require minimum deposits. The bankers also aver that their banks deny secured credit cards to between 5–40% (depending on the bank) of those who apply.

At the very end of the 900 recorded message, patient callers were indeed given a toll free 800 number to call the 800 number for US Sales. Those who then called the 800 number were solicited to buy a membership in US Sales for $99.95. The parties dispute exactly what US Sales operators told callers who called the 800 number. The F.T.C. has introduced the affidavit of Ellen Mixson who avers that she was informed that by obtaining a life membership in US Sales for $99.95, she would be "guaranteed a secured credit card." Dean Vlahos avers that callers were informed that they would have to meet certain minimum income criteria and have a verifiable address. It is undisputed, however, that callers to US Sales 800 number were not informed that there would also be an application fee or that they might be denied a secured credit card based on their credit histories.

Consumers who purchased US Sales memberships for $99.95 received a packet of information on membership benefits, including, among other things, an application for a secured credit card from the First National Bank of Marin. According to Dean Vlahos, US Sales had an agreement with the First National Bank of Marin such that members of US Sales would be "preapproved" to receive a secured credit card provided that those members (a) had income of $1,000.00 per month and (b) would deposit at east $300.00 in a savings deposit with that bank. The applications required an additional application fee of $60–$100, however. In addition, the First National Bank of Marin does refuse applications for secured credit cards based on credit history, including members of US Sales. *See* Affidavits of William M. Henderson and Douglas R. Deitel. The fact that Dean Vlahos avers that he an "understanding" with First National Bank of Marin that US Sales members would be "pre-approved" is irrelevant. US Sales members, like any other applicant for a First National Bank of Marin secured credit card, could be turned down based on a poor credit history.

C. *Consumer Expenditures*

Consumers placed 485,675 calls to 1–900–HOT–CARS between January 26, 1990 and

February 28, 1991 and were billed a total of $6,645,620.84 for those calls. Consumers placed 152,866 calls to 1–900–VISA–123 between November 1, 1990 and February 28, 1991 and were billed a total of $2,483,-622.77. Between February 26, 1990 and February 28, 1991, 41,363 callers who purchased memberships in US Sales had their memberships billed to their telephone bills rather than to their credit cards. They were billed a total of $4,133,332.30.

### Procedural History

On June 24, 1991, this court granted the F.T.C.'s motion for a temporary restraining order. The parties stipulated to a preliminary injunction on July 25, 1991 which included a freeze on Defendants' assets. The defendants have made frequent requests for modification of the asset freeze based on a variety of grounds. Some of the money that Defendants have requested be unfrozen has been to pay operating expenses of the business. Other times, the money has been to pay employees' salaries or for attorneys' fees. The other significant action taken in this case occurred on November 5, 1991 when the court held Defendants in contempt for having violated the terms of the preliminary injunction.

### Discussion: Liability

#### A. Standard of Review

Rule 56 of the Federal Rules of Civil Procedure requires this court to enter summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Put another way, [the court must] decide 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Brownell v. Figel*, 950 F.2d 1285, 1289 (7th Cir.1991), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d

202 (1986). The court must review the record and draw all inferences from it it in the light most favorable to the non-movant. *Lohorn v. Michal*, 913 F.2d 327, 331 (7th Cir.1990).

#### B. Hot Cars

##### 1. Introduction

The FTC contends that Defendants have engaged in three forms of unfair and deceptive trade practices with respect to the marketing of information about how to purchase cars at government auctions. First, the FTC contends that the television and radio commercials for 1–900–HOT–CARS are deceptive because they misrepresent the service being advertised and, alternatively, because Defendants lacked a reasonable basis for making the claims they did. Second, the FTC contends that consumers who called the 1–900–HOT–CARS number were misinformed that by staying on the line they would receive a toll-free 800 number which would provide them with additional information about vehicle auctions. Third, the FTC contends that Defendants misrepresented the benefits of a membership in US Sales to those who called the 800 number.

Each of the FTC's three arguments will be addressed in turn.

##### 2. Television and Radio Ads for 1–900–HOT–CARS

Section 5(a) of the FTC Act forbids "unfair or deceptive acts or practices." 15 U.S.C. § 45(a). "[T]o establish that an act or practice is deceptive, the FTC must establish that the representations, omissions, or practices likely would mislead consumers, acting reasonably, to their detriment." *F.T.C. v. World Travel Vacation Brokers*, 861 F.2d 1020, 1029 (7th Cir.1988). The Seventh Circuit has also stated that:

In addition, '[m]isrepresentations of material facts made for the purpose of inducing consumers to purchase services constitute unfair or deceptive practices forbidden by Section 5(a).'

*Id.*, quoting *F.T.C. v. Kitco of Nevada, Inc.*, 612 F.Supp. 1282, 1291 (D.Minn.1985).

Defendants have made representations about their business of providing information about automobile auctions that likely would mislead consumers, acting reasonably, to their detriment. Defendants' radio and television commercials represent that by calling a 900 number, listeners and viewers can obtain information enabling them to acquire automobiles at a very low price.

■ In deciding questions of ad interpretation, this court should look to the "overall, net impression made by the advertisement in determining what messages may reasonably be ascribed to it." *In re Kraft, Inc.*, available on Westlaw, FATR–FTC database, 1991 FTC LEXIS 38, at *13 (F.T.C. Jan. 31, 1991). *See also Removatron International Corp. v. FTC*, 884 F.2d 1489, 1497 (1st Cir.1989) (looking to "commonsense net impression" of an allegedly false and deceptive advertisement). This court may and has examined the advertisements to determine whether the net impression is such that the ads would be likely to mislead reasonable consumers. *See FTC v. Colgate–Palmolive Co.*, 380 U.S. 374, 85 S.Ct. 1035, 13 L.Ed.2d 904 (1965) (meaning of an advertisement may be determined by an examination of the advertisement itself).

The television commercials for 1–900–HOT–CARS convey the impression that by calling the 900 numbers, one will actually receive information about how and where to buy automobiles for tremendous savings. The court concludes that there is no genuine issue of fact that the net impression of the television advertisements upon a reasonable viewer is that by calling 1–900–HOT–CARS consumers will obtain information about how to buy confiscated and repossessed automobiles in top condition for extremely low prices.

The television commercials enthusiastically insist that cars are available for "hot prices." The television spots announce that the sales price could be as low as $100. As discussed above, the commercials stressed "$100" through a variety of devices such that "$100" is a crucial part of the net impression of the message. *See Raymond Lee Organization, Inc.*, 92

F.T.C. 489, 618–619 (1978), *aff'd,* 679 F.2d 905 (D.C.Cir.1980) (Crucial component of message of advertisements was the emphasis on truthful but unrepresentative success stories about the service being advertised).

In addition, the advertisements refer to the cars as "hot cars" and state that the cars for sale have been repossessed by banks or confiscated by the government. Labelling the cars as "hot" and explaining that the cars are being sold following repossession or confiscation puts a special "spin" on the claims made in the advertisements about the low price and high quality of the cars for sale. Because these cars are depicted as being sold under unusual circumstances, there is a greater reason to believe the message that the cars will be sold at prices far below the market price. The term "hot cars," moreover, signals that the cars can be acquired at "stolen car" prices.

The commercials also state that the cars that can be purchased for as little as $100 are in "good condition." The television ads flash pictures of different late model sports cars of showroom-quality. The availability of cars in good condition forms another crucial part of the net impression of the advertisements. The "fine print" disclaimer, "Vehicles shown for illustration purposes only," does nothing to modify the impression. As discussed above, it is extremely difficult to read the disclaimer when viewing the advertisement; the disclaimer would have no effect on the impression made by the commercial on a reasonable viewer.

■ Apart from the court's independent assessment of the "net impression" of Defendants' television advertisements, the FTC has also introduced evidence that viewers of the ads believed that they had been sold information on how to purchase automobiles *far* below market value. The FTC has offered the affidavit of Archie Ingram. Ingram is a Sales Manager for the United States General Services Administration for Region 5. His duties include supervision of 4–6 vehicle auctions each month in Region 5. He avers in his affida-

vit that "[o]n numerous occasions over the last several years, persons in the audience at these auctions have identified themselves as members of U.S. Sales and have asked about the vehicles being auctioned for a hundred dollars." [5]

The FTC also offered the affidavits of three US Sales members, M.T. Hawkins, Verdo Samuels and Joedder Galloway Collins. These statements also demonstrate that viewers of the HOT CARS television commercials were likely to believe that by calling the 900 number they could gain information enabling them to obtain very good deals on cars. In their affidavits, the three aver that the HOT CARS television commercials led to believe that by attending auctions they could acquire a "late model car" at a "very good price." For Hawkins a very good price was anything less than $900, for Samuels $1000–1500, and for Collins $500.

The court also concludes that there is no genuine issue of fact that the radio commercial also conveys the net impression that by calling 1–900–HOT–CARS consumers can obtain information about how to purchase automobiles in good condition for extremely low prices. The radio ad in question states that the prices are so low, "They're practically giving them away," it mentions the $100 value and it declares that the cars are in good condition. As discussed above, these claims are particularly believable because the cars are depicted as "hot" repossessed and confiscated cars being sold under unusual circumstances.

In addition, Defendants insist that their advertisements consist merely of "puffing" that a *reasonable* consumer would not be misled by such typical advertising hyper-

bole. In support of this argument, Defendants cite several cases, though none more recent than 1949. The defendants' advertisements at issue go beyond mere puffing. In its 1983 Deception Statement, the FTC elaborated upon what puffing does and does not entail:

'Puffing' refers generally to an expression of opinion not made as a representation of fact. A seller has some latitude in puffing his goods, but he is not authorized to misrepresent them or to assign to them benefits they do not possess. Statements made for the purpose of deceiving prospective purchasers cannot properly be characterized as mere puffing.

Deception Statement, 103 F.T.C. 174, 181 n. 42, appended to *Cliffdale Associates, Inc.*, 103 F.T.C. 110 (1984).

■ The court agrees with the F.T.C. that puffing does not include misrepresentations of the facts or statements made for the purpose of deceiving prospective purchasers. In this case, Defendants' representations about the quality and cost of the cars available by auction are representations of fact and not of opinion. Therefore, they can not be excused as puffing. Moreover, as is discussed in the following paragraphs, the Defendants' commercials quite clearly were designed to deceive prospective purchasers into believing that by calling the HOT CARS 900 number, they would be receiving information different from what they actually received.

Having thus concluded that there is no issue of fact that the net impression of the radio and television advertisements for 1–900–HOT–CARS is that callers will receive information about buying excellent cars at extremely low prices, the court now must

5. In their motion to strike certain evidentiary materials, Defendants argue that Ingram's statement is "rank hearsay." To the extent that his statement avers that people asked about cars for sale for one hundred dollars, it is not hearsay. Ingram's statement to that extent is admissible testimony about a verbal act that he personally witnessed. To the extent that Ingram's statement is used to establish that US Sales members were the ones inquiring, there is a hearsay problem. Unless a hearsay exception applies, that the people who approached him were actually

US Sales members can not be concluded from Ingram's statement. The court believes that adequate circumstantial guarantees of trustworthiness exist here and that under Rule 803(24) Fed.R.Evid., Ingram's statement can be used to establish that actual US Sales members approached him to inquire about cars for one hundred dollars. The people who approached Ingram said things that one would expect to be said by US Sales members and the self-identifications were made at a place where US Sales members would be likely to go.

determine whether an issue of fact exists as to whether callers actually received such a service. The FTC has presented evidence that callers of 1–900–HOT–CARS were not informed of sales at which they could acquire cars in good condition for very good prices. Rather callers were informed of sales at which cars in poor condition were sold for low prices (perhaps market price for cars in poor condition) and at which cars in good condition were sold somewhere in the neighborhood of fair market value.

The FTC has introduced the affidavit of Jeffrey Fratter. Fratter is the Chief of the United States Marshals Service, Department of Justice, Arlington, Virginia. He is responsible for the management and administration of the National Asset Seizure and Forfeiture Program. United States Marshals have custodial responsibility for property seized for forfeiture pursuant to laws enforced and administered by the Department of Justice. United States Marshals dispose of automobiles and other items which have been seized by the Drug Enforcement Agency, the Federal Bureau of Investigation, and the Immigration and Naturalization Service. According to Fratter, the United States Marshals Service sold 12,808 forfeited vehicles in fiscal year 1990. In his affidavit, Fratter further avers that the clear majority of the vehicle sales involved cars which due to lack of repair or inoperability were worth less than $2000. The cars for sale through the Marshals Service were not the high quality "hot" cars advertised as available by US Sales.

Archie Ingram, Sales Manager of the United States General Services Administration, Region 5, stated in his affidavit that the sales he supervises also do not yield hot deals. According to Ingram, the vehicles sold at his auctions generally sell for at least whole sale or retail market value. The vehicles are auctioned with a reserve price determined by the National Auto Dealers Association (NADA) Used Car Price Guidelines and that Region 5 has the right to withdraw the vehicle if the reserve price is not met.

Ronald Flender, Commander of the Impoundment Unit of the Cincinnati Police Division, stated in his affidavit that the Cincinnati Police Division holds approximately 26 auctions per year. 98 percent of the cars auctioned are unclaimed vehicles, nearly all of which are without keys. Unclaimed vehicles are those that have been towed and then not subsequently claimed. The cars had been towed because the owner is in custody, has parked in a restricted area or has delinquent parking citations. According to Flender, the unclaimed vehicles are generally older vehicles in disrepair. The minimum bid for these vehicles is $35, which is generally their *salvage* value.

According to Flender, the other 2 percent of the cars auctioned are vehicles seized from drug dealers and auctioned pursuant to court order. The minimum bid for these vehicles is ⅔ of the loan value as determined by the NADA Guidelines and the Cincinnati Police Division has the right to withdraw the vehicle if the price is not met. Although Flender stated that a 1975 Ford Grenada had been sold for $200 within the past three years, he emphasized that the selling prices vary depending upon the condition and make of the car.

Paul Upgrove, Ronald Waldman and Michelle Pisut were all investigators for the FTC who attended auctions in Los Angeles, New York and Chicago, respectively. They each averred in their affidavits that the vehicles for sale at the auctions they attended were in poor condition and that many of the cars were inoperable. The affidavits of US Sales members Hawkins, Samuels and Collins also provide evidence that the 900–HOT–CARS message did not provide consumers with information about the sale of cars in good condition for very little money.

Defendants respond by arguing that the FTC only came forward with evidence on a small sample of the many auctions that 1–900–HOT–CARS have informed callers about. Defendants assert that the FTC has failed to show that it is impossible to obtain a car in good condition for far below its market value. The FTC, however, does

748

not need to show that it is impossible to obtain a tremendous deal on a car through one of the auctions mentioned in the 1–900–HOT–CARS message. That would be impossible to prove. For one thing, Defendants did not keep records of every auction mentioned on the 1–900–HOT–CARS messages. *See* Exhibit 3 of Exhibits in Support of Memorandum for T.R.O. (Response to Request No. 5).

■ In addition, the FTC needs only to show that a reasonable consumer, upon hearing the advertisement, likely would be misled to his detriment. *See World Vacation Travel Brokers.* In other words, the FTC is only required to show that it is likely, not that it is certain, that a reasonable consumer would be misled. Accordingly, the FTC does not need to show that *every* reasonable consumer would be misled by the advertisements nor does the FTC need to show that callers of 900–HOT–CARS *never* can find a bargain. Indeed, advertisements are illegal if they have a "tendency" or "capacity" to deceive; actual deception of particular consumers need not be proven. *Trans World Accounts, Inc. v. F.T.C.*, 594 F.2d 212, 214 (9th Cir.1979). The FTC needs only to show that it is likely that reasonable consumers will be misled. As a result, based on material, uncontested facts, the court finds that Defendants' radio and television commercials for 1–900–HOT–CARS were in violation of § 5(a) of the FTC Act.

Defendants argue that the FTC's own evidence demonstrates that a genuine issue of fact exists as to whether vehicles in good condition can be acquired at substantial savings at auctions mentioned through 1–900–HOT–CARS. Defendants point to the affidavit in which Michelle Pisut avers that she was "told that a realistic bid would be approximately one half the market value of the vehicle." Apart from being inadmissible as hearsay, that remark does not demonstrate that vehicles can actually be bought at half-price, but rather half-price would be an acceptable opening bid.

The defendants also contend that Ronald Flender's statement that the minimum bid on confiscated cars auctioned by the Cincinnati Police Division is "⅔ of the loan value as determined by the NADA (National Automobile Dealers Association) book." Flender's statement, however, does not indicate what a winning bid would be. It only gives a percentage for a starting bid. Finally, Defendants rely on Archie Ingram's statement that at GSA auctions, vehicles are "generally sold for a minimum of wholesale, retail or fair market value as determined by the National Auto Dealers Association Used Car Guidelines." Ingram's stating that GSA vehicles are generally sold at prices established by the NADA Guidelines does not create a genuine issue of fact as to whether automobiles of high quality can be purchased at very low prices. Acquiring a car for its NADA value is hardly a "hot deal." The fact that Ingram qualified his statement with the word "generally" does not mean that a material number of vehicles sold below NADA Guideline prices.

■ In addition to the lack of veracity of the advertisements, there is a second grounds for finding that Defendants' commercials for 1–900–HOT–CARS violated § 5(a). Apart from challenging the truthfulness of an advertiser's representations, the FTC may challenge the representation as unsubstantiated if the advertiser lacked a reasonable basis for its claims. *See Thompson Medical Co., Inc. v. F.T.C.*, 791 F.2d 189, 193 (D.C.Cir.1986), *cert. denied,* 479 U.S. 1086, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987) (advertisement considered deceptive if advertiser lacks a "reasonable basis" to support the claims made in it); *Sears, Roebuck and Co. v. F.T.C.*, 676 F.2d 385 (9th Cir.1982). This approach "is particularly useful where the validity of the claim is uncertain, but the lack of substantiality is clear." *Cliffdale Associates*, 110 F.T.C. at 173; *see also Litton Industries*, 97 F.T.C. 1 (1981), modified 676 F.2d 364 (9th Cir.1982).

■ The "reasonable basis" test is an objective standard. An advertiser's good faith belief that his claim is substantiated is not enough. *Cf. F.T.C. v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir.1988) (advertiser's good faith

does not immunize it from responsibility for its misrepresentations).

In claiming that they had a reasonable basis for the claims made in their HOT–CARS commercials, Defendants rely on a variety of sources: a computer printout from a Department of Defense document, several newspaper advertisements, a number of unsworn consumer testimonials, and a magazine article. None of these is sufficient alone or in tandem to provide Defendants with a reasonable basis for their claims.

The computer printout from a document promulgated by the Department of Defense reflected the sale at auction of vehicles used by that agency. 40 of the 42 vehicles on the page attached as Exhibit B to Dean Vlahos' affidavit sold for under $500. These Department of Defense vehicles, however, were hardly in good condition. 41 of the 42 vehicles were categorized by the printout as in either "Unserviceable (Reparable)" or "Unserviceable (Condemned)" condition.

The Department of Defense estimated that 17 of those 41 unserviceable vehicles required repairs totaling 16–41% of the original acquisition cost. 16 of the 41 vehicles were estimated to require repairs totaling 41–65% of the original acquisition cost. The remaining 7 of the 41 "unserviceable" cars required repairs in excess of 65% of the original acquisition cost. The only vehicle not listed as "unserviceable" was designated as in "Used poor" condition. "Used poor" condition is defined to mean that the vehicle "may be used without repairs, but is considerably worn or deteriorated to the degree that remaining utility is limited or major repairs will soon be required." Given the poor condition of the vehicles listed on the Department of Defense printout, that document can hardly be regarded as providing Defendants with a "reasonable basis" for making the claim that by calling 1–900–HOT–CARS callers will receive information about acquiring cars in good condition for great bargains. Not only were the Department of Defense vehicles in bad condition, they may have been sold at relatively low prices because they simply were not worth more.

In addition, the printout from the Department of Defense can not be considered as substantiating Defendants' advertising claims because it is out of date. All of the vehicles listed on the printout were sold in 1976 and early 1977. *See* Affidavit of Susanne G. Metzger (Chief of Sales Contracting Branch of the Directorate of Marketing for the Defense Reutilization and Marketing Service).

Second, the newspaper advertisements of auctions, attached to Vlahos' Affidavit as Exhibit B, do not provide a "reasonable basis." Some of the advertisements state minimum bids as low as $15 and $25. Other of the newspaper ads state the auctions are "absolute auctions" and that bids need not meet a minimum threshold. These ads do not indicate what *winning* bids are, however. Indeed, the fact that some auctions may be "absolute auctions" does not at all mean that the sales prices are particularly low. The HOT CARS commercials promise information on actually acquiring a car, not the opportunity to make an unsuccessful, low bid.

Third, the article from *Savvy* magazine, attached to Vlahos' Affidavit as Exhibit C, does not provide the necessary "reasonable basis." The magazine article asserts that at one auction conducted in Brooklyn, New York, a 1983 Mazda sold for $3,000 less than its book value, a Volvo worth approximately $9,000 sold for $1,300, and the average discount on the 16 cars sold at that auction was 65% below their book value. The magazine article does not provide a reasonable basis for Vlahos' advertisements simply because of the adage "you can't always believe what you read." Before making the representations they did, Defendants were under an obligation to uncover the facts themselves rather than to rely heavily on the hearsay reporting of a two page magazine article. The author of the article seems, in fact, to have relied in large part on what he was told by Dean Vlahos. Vlahos was quoted several times in the article which also included a plug for US Sales.

Finally, Defendants point to nine unsworn "testimonials" from US Sales members and a sheet of paper with a name, address, telephone number, and a description of a vehicle. *See* Vlahos Affidavit, Exhibit E. The testimonials purport to be from US Sales members who have purchased vehicles of a variety of makes and models at prices ranging from $200 to $4700. Some of the testimonials are undated; the oldest dated testimonial is from March 1, 1990. Most of the persons filling out the testimonials wrote that they learned about US Sales from a radio or television commercial, although two people state that they heard about US Sales from a friend. Because the testimonials are from after the time the advertisements were aired, Defendants clearly could not have relied upon them as substantiation for their advertising claims.[6] *See F.T.C. v. Solar Michigan, Inc.*, 1988–2 Trade Ca. (CCH) ¶ 68,339, 1988 WL 147604 (E.D.Mich. 1988). Moreover, nothing in the testimonials relates to whether the cars allegedly purchased were in decent condition or not.[7]

### 3. Advising Callers to Stay on the Line

■ The FTC alleges that Defendants engaged in a second unfair and deceptive practice by informing people who called 1–900–HOT–CARS that at the end of the message they would be given a toll-free 800 number for additional information about buying cars. The court agrees.

First of all, callers of 1–900–HOT–CARS, who were told at the beginning of the message to stay on the line for the 800 number, were not informed how long they would have to wait while the 900 number expenses piled up. Callers waiting for the 800 number had to wait through a recorded message informing them of auctions in various places in the United States, most of which would not have been located in their own cities. They were given no estimate of how much money they would have to spend until they were finally provided with the 800 number.

Second, the 800 number was not really a number to call for more information at all. The 800 number was a device to sell callers memberships in US Sales. This is completely contrary to the representation made at the beginning of the recorded messages played to callers of 1–900–HOT–CARS. Callers of the 900 number were informed that they would be given an 800 number for them to call to receive more information; they were not told that the 800 number was actually a device for the solicitation of $99.00 memberships in US Sales. Even though callers of the 800 number were able to ask a few questions, the main purpose and effect of the 800 number was to solicit sales of $99.00 memberships.

### 4. Sales Pitch for US Sales

In its complaint (paragraphs 26–28), the FTC alleges that Defendants misrepresented the value of memberships in US Sales to those who called the 800 number. This matter was not argued in the parties' briefs and the F.T.C. has not presented evidence regarding the contents of Defendants' sales pitch for memberships. Defendants have presented evidence that members of US Sales receive a package of benefits. Summary judgment is thus not appropriate on the issue of whether the sales pitch for membership in US Sales violates the FTC Act. In light of considerations discussed above, however, to the extent that the operators of Defendants' 800 line have tried to sell memberships in US Sales by promising information on how to buy cars in good condition at prices well

---

**6.** In addition, the testimonials can not be considered as evidence relating to the truth of the advertisements' claims because they are not authenticated.

**7.** The court notes that the FTC has provided the affidavits of two individuals, Lucy Cintron and Khaled Samara, who both state that they are US Sales members and who deny that they ever signed testimonials. During discovery, however, Defendants provided the FTC with what purports to be testimonials from Cintron and Samara. (These testimonials were not attached to Vlahos' Affidavit). In what purports to be Cintron's testimonial, the person who filled out the form wrote that he or she purchased a 1987 Datsun 200ZX for only $100. The person who filled out what purports to be Samara's testimonial wrote that he or she purchased a 1990 Chevy Trans-Am for only $50.

below market value, Defendants have violated § 45(a)'s prohibition against "unfair" and "deceptive" practices.

### C. VISA–123

#### 1. Introduction

The F.T.C. alleges that Defendants have engaged in unfair and deceptive practices with respect to the VISA–123 service. First, the F.T.C. contends that Defendants' advertisements are deceptive because they misrepresent the service being advertised. In particular, the F.T.C. argues that the advertisements for 1–900–VISA–123 are deceptive because Defendants can not provide callers with information about acquiring secured credit cards regardless of their credit histories. Second, the F.T.C. contends that the recorded message is unfair and deceptive inasmuch as it encourages callers to stay on the line to receive an 800 number for free assistance in obtaining a secured credit card regardless of consumers' credit histories.

#### 2. 1–900–VISA–123 Commercials

■ Applying the same legal standard of analysis as it did for the 900–HOT–CARS advertisements, the court concludes that summary judgment is also warranted with respect to Defendants' trade practices in connection with the 900–VISA–123 business.

The overall net impression of Defendants' advertisements of the 900–VISA–123 numbers is that by calling the 900 number one could obtain a secured credit card regardless of one's credit history. The advertisements in fact make an express representation that regardless of a consumer's credit history, he or she will not be refuse a secured credit card. The television commercial also assures viewers that "you will not be turned down." These express representations were false, however. The 900–VISA–123 recorded message advised callers of banks that do consider credit history and do deny secured credit cards to applicants on that basis.

■ Defendants argue that in making their representations, they were relying on promotion material put out by the banks themselves. Good faith belief in a deceptive advertisement is no defense, however. *See Chrysler Corp. v. F.T.C.*, 561 F.2d 357 (D.C.Cir.1977) (advertiser's good faith does not immunize it from responsibility for its misrepresentations; intent to deceive is not a necessary element of a violation of § 5); *Porter & Dietsch, Inc. v. F.T.C.*, 605 F.2d 294 (7th Cir.1979) (advertiser's good faith is no defense to § 12 violation).

In addition, the Defendants argue that the "fine print" disclaimers at the bottom of the screen in the final seconds of the television commercial are sufficient to qualify the otherwise express representations of the commercial. As discussed above, the "fine print" is simply not readable and has no effect on the overall net impression of the advertisement. The disclaimers are simply inadequate to allow Defendants to escape liability.

> Disclaimers or qualifications in any particular ad are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression. Anything less is only likely to cause confusion by creating contradictory meanings.

*Removatron International Corp. v. F.T.C.*, 884 F.2d 1489, 1497 (1st Cir.1989).

#### 3. Advising Callers to Stay on the Line

■ The FTC alleges that Defendants engaged in a second unfair and deceptive practice by informing people who called 1–900–VISA–123 that at the end of the message they would be given a toll-free 800 number for additional information about obtaining secured credit cards. The court agrees.

First of all, callers of 1–900–VISA–123, who were told at the beginning of the message and throughout the message to stay on the line for the 800 number, were not informed how long they would have to wait while the 900 number expenses piled up at the rate of three dollars per minute. Callers waiting for the 800 number had to sit through a recorded message informing them of a list of banks they could write to

throughout the United States. They were given no estimate of how much money they would have to spend until they were finally provided with the 800 number.

Second, the 800 number was not really a number to call for more information at all. The 800 number was a device to sell callers memberships in US Sales. This is completely contrary to the representation made throughout the recorded messages played to callers of 1–900–VISA–123. Callers of the 900 number were informed that they would be given an 800 number for them to call to receive more information; they were not told that the 800 number was actually a device for the solicitation of $99.95 memberships in US Sales. Even though callers of the 800 number were able to ask a few questions, the main purpose and effect of the 800 number was to solicit memberships.

## Discussion: Remedy

Having discussed Defendants' liability, the court next turns to the issue of remedy. The F.T.C. argues that it is entitled to recover $13 million in the form of consumer redress as well as injunctive relief. This court agrees that the F.T.C. is entitled to recover over $9 million as redress and that a permanent injunction with ancillary equitable relief is also called for. In view of the complexity of this case, however, the court will only outline the elements of the order it will issue. In the final section of this opinion, the parties are ordered to submit proposed orders consistent with the court's ruling in this opinion. The court will evaluate the proposed orders (and eventually supporting memoranda) before issuing its final order in this case.

Section 13(b) of the FTC Act provides that "in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction." In light of *World Travel Vacation Brokers,* there is no question that this case qualifies as a "proper case" for permanent injunctive relief. In that case, the Seventh Circuit held that cases involving a "straightforward violation of section 5" are "proper cases" for the issuance of a permanent injunction. *See id.* at 1028. The court thus concludes

that a permanent injunction barring Defendants from running the radio and television commercials cited in this opinion is warranted and desirable.

In addition to injunctive relief, the court is empowered to grant ancillary relief "necessary to accomplish complete justice." *F.T.C. v. H.N. Singer,* 668 F.2d 1107, 1113 (9th Cir.1982). According to the Seventh Circuit, "the statutory grant [in Section 13(b)] of authority to the district court to issue permanent injunctions includes the power to order any ancillary equitable relief necessary to effectuate the exercise of the granted powers." *F.T.C. v. Amy Travel Service, Inc.,* 875 F.2d 564 (7th Cir.1989).

The power to grant ancillary relief includes the power to order the repayment of money for consumer redress as restitution or rescission. *See id.* at 571 ("Rescission and restitution are proper forms of ancillary relief"); *see also World Travel Vacation Brokers,* 861 F.2d at 1031. This is a case in which redress is appropriate, given the public equities at stake and the FTC's mission to enforce the provisions of the FTC Act.

Defendants argue that redress is not appropriate here, because neither the doctrine of rescission nor that of restitution applies. With respect to rescission, Defendants argue that because consumers are unable to return what they received, information, the doctrine of rescission is not available. Defendants argue that rescission is used to restore the *status quo ante* which, in this case, is impossible to restore considering the nature of the product sold, information. Moreover, Defendants argue that restitution is not appropriate to the extent that US Sales provided value in exchange for the payments it received from consumers.

In support of their arguments, Defendants rely exclusively on cases involving private parties. They fail to cite any cases in which the FTC has sought redress on behalf of a large class of consumers. The courts have ruled that FTC fraud actions are of a different character altogether from private fraud actions. They have

been sensitive to the fact that the FTC can not be expected to carry out its legislative mandate if actions under § 13(b) are treated the same as private fraud actions. *See Amy Travel Service*, 875 F.2d at 574 ("We find that imposing a requirement that the FTC prove subjective intent on the part of defendants to defraud would be inconsistent with the policies behind the FTC Act and impose too great a burden on the FTC").

The court thus concludes that the Defendants use of deceptive advertisements supports an award for consumer redress. The Eighth Circuit reasoned similarly when it ruled that the FTC did not have to show actual reliance on the false statements in an advertisement in order to obtain consumer redress:

> This is not a private fraud action, but a government action brought to deter unfair and deceptive trade practices and obtain restitution on behalf of a large class of investors. It would be inconsistent with the statutory purpose to require proof of subjective reliance by each individual consumer.

*F.T.C. v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1316 (8th Cir.1991).

In other cases brought under Section 13(b), the proper amount of restitution has been held to be the purchase price of the relevant product or business opportunity, less any refunds or money earned. As the court in *F.T.C. v. Atlantex Associates*, 1987–2 Trade Cas. (CCH) ¶ 67,788, at 59,-256, 1987 WL 20384 (S.D.Fla.1987), stated:

> It is an appropriate remedy authorized by this Court's equitable powers to require the individual and corporate Defendants to pay consumer redress in the form of a cash refund measured by amounts previously paid less any amounts returned to consumers who invested in the ... partnerships.

*See also F.T.C. v. Atlantex Associates*, 872 F.2d 966 (11th Cir.1989) (awarding consumer redress in an amount equal to total amounts paid by investors).

Consequently, the court finds that consumer redress in the amount of $9,129,-243.84 is called for. This $9 million figure is the sum of the total money spent by consumers on 1–900–HOT–CARS and 1–900–VISA–123. The two defendants, the US Sales Corporation and Dean Vlahos, are jointly and severally liable for this sum. The undispute evidence has shown that Vlahos knew or should have known of the acts at issue and that Vlahos both participated in them directly and had the authority to control them. Vlahos ran his business first as a sole proprietorship and then was the President and sole shareholder of US Sales. He controlled the daily operations of the corporation, negotiated contracts, and even was the voice used in the 900 recordings. Thus, under *F.T.C. v. Amy Travel Service*, 875 F.2d at 573, Vlahos is individually liable for the consumer redress ordered in this action.

The court further rules that ancillary equitable relief is necessary to accomplish complete justice in this case. Merely prohibiting the advertisements discussed in this opinion is insufficient, especially considering Defendants' contemptuous behavior in violating the Preliminary Injunction Order. Ancillary equitable relief will be necessary to effectuate enforcement of Section 5 of the FTC Act and to deter future violations by these Defendants.

The court concludes therefore that the permanent injunction should require Defendants to obtain a performance bond for any future sales of credit card or auction information. The order should also require Defendants to report their addresses and places of employment or business, and any subsequent changes in this information to the F.T.C.

### Parties Ordered to Submit Proposed Orders

The parties are ordered to submit proposed orders taking into consideration the court's discussion of remedy in the previous section. The proposed orders must be filed within one week of the issuance of this memorandum opinion, with a copy sent to the other party. The parties will then be given one week to write a memorandum not to exceed five pages in which each side is to argue in favor of its proposed order

and against the other side's proposed order. There will be no responses or reply memoranda.

The court requests that this procedure be followed in order to tailor effective equitable relief in this relatively complex case, a case which may require a sustained period of monitoring by the F.T.C. to ensure adequate compliance. Until an order is entered, the preliminary injunction issued in this case remains in effect.

### Conclusion

Plaintiff Federal Trade Commission's motion for summary judgment on counts II and III is granted. The parties are ordered to submit their proposed orders consistent with this opinion within one week. Supporting memoranda are due within one week of the proposed orders.